Argued July 10, reversed December 19, 1974, petition for
rehearing denied February 11, 1975

# PUBLISHERS PAPER CO., *Appellant, v.*
# DEPARTMENT OF REVENUE, *Respondent.*

530 P2d 88

738

*John C. Caldwell* of Hibbard, Caldwell, Canning, Bowerman & Schultz, Oregon City, argued the cause and filed briefs for appellant.

*G. F. Bartz,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and Theodore W. deLooze, Chief Tax Counsel, Salem.

O'CONNELL, C. J.

Plaintiff appeals from a decree[1] of the Oregon Tax Court sustaining an order of the Oregon Department of Revenue[2] establishing the value of plaintiff's real property as of January 1, 1971. The subject property is an integrated lumber and plywood mill complex located in southeastern Portland. The parties to this litigation are in substantial agreement as to the determinants of value of this property with the exception of one factor: the effect upon fair market value of special functional obsolescence caused by incurable site deficiencies. Both agree that the plant must be valued by the cost-summation approach and that this approach yielded a value of $7,515,410 as of the valuation date. Both agree that the plant suffers from site deficiencies which would cause a prospective purchaser to discount the value of the plant in comparison to a plant of similar cost without such deficiencies. The parties disagree, however, as to the appropriate discount. The plaintiff contends that a proper evaluation of functional obsolescence requires reduction of the assessed

---

[1] 5 OTR 346 (1973).
[2] Order No. VL-72-399.

value by an additional $1,941,031. The defendant maintains that the ordered value of $7,515,410 already reflects a discount of approximately 5% of the depreciated reproduction cost of the plant and that this allowance was sufficient. After hearing the evidence, the Tax Court accepted the position of the defendant. The plaintiff seeks our review de novo.

Functional obsolescence in the world of appraising is a species of depreciation and may be defined as a

"* * * lack of desirability in layout, style, and design and compared with that of a new property serving the same function."[9]

In the present case the subject property is a lumber and plywood plant laid out in the 1920's. It was built astraddle Johnson Creek to allow waste material to be carried away by the stream. Today this practice is unacceptable on both ecological and economic grounds so that the once beneficial creek now interferes with modern waste handling. The creek's path through the plant site also interferes with the flow of other materials and increases general maintenance expense due to extra fences and crossings. In addition, the plant site is bisected by S. E. 100th Avenue, a public thoroughfare and crossed by Glenwood Street, another public road. The primary effect is that handling of materials, especially logs, is hindered. Logs must be moved from storage to processing facilities on log trucks rather than by modern log lift trucks. In addition, the logs on the trucks must be secured to public road standards of safety rather than the less exacting standards that would suffice away from the public and are

[9] American Institute of Real Estate Appraisals, *The Appraisal of Real Estate,* 61 (5th ed. 1967), hereinafter "Appraisal of Real Estate."

subject to licensing, overweight and other regulations. All ground communications within the plant are inconvenienced by the necessity of crossing a stream of traffic not subject to company control. Finally, new concepts of management and new technology have made the general layout and interrelationship of the building less than desirable.

As stated above, the parties agree that these site deficiencies would be taken into account in the market to reduce the value of the property below the sum of the costs of its parts. The dispute between them centers upon the magnitude of the appropriate discount. Evaluation of their respective positions is complicated, however, by the fact that they have chosen different methods to reach their results.

The Multnomah County Assessor incorporated the factor of functional obsolescence into the depreciation of each of the items which were then summed up to yield the overall value of improvements and machinery. This was done by using figures at the higher end of the scale of allowable depreciation values for each item. The effect of this, according to the testimony of one of the defendant's witnesses, was an overall reduction in the neighborhood of 5%. Upon cross-examination, he adamantly refused to be more precise than that.

Plaintiff, on the other hand, chose to derive a value for special functional obsolescence more systematically by attempting to follow the method recommended to assessors by the defendant in its own Industrial Appraisal Manual,[4] a method approved by this court in *Reynolds Metals v. Dept. of Revenue.*[5]

---

[4] Oregon State Tax Commission, Valuation Division, *Industrial Appraisal Manual,* 61-62.

[5] 258 Or 116, 477 P2d 888, 481 P2d 352 (1971).

This method, based on the definition of functional obsolescence as the reduction in value due to excess operating costs produced by faulty layout, requires comparison of the operating costs of the subject property with the operating cost of a functionally similar plant lacking the deficiencies. The excess operating cost of the subject property is then capitalized and deducted from the value of the plant arrived at without reference to the deficiencies. There is complete agreement in this case that this method is the best available under current theory.

In plaintiff's approach, the optimum plant employed as the basis of comparison with the actual plant was a hypothetical model developed by a Mr. Del Collinson, a consulting engineer employed for this purpose. Plaintiff's presentation of its case was greatly hampered by the death of Mr. Collinson in an airplane crash just after the hearing before the Department of Revenue. In the Collinson model presented for plaintiff by other experts hired to replace Mr. Collinson, the present improvements and equipment are utilized but rearranged on the site to minimize materials handling cost on the assumption of the absence of the streets and the stream. A detailed comparison of the equipment and personnel needs of the current plant with the hypothetical plant by Mr. Collinson and his successors indicated excess needs of the current plant to be 50 employees and 16 pieces of equipment. Capitalization of the annual costs of fulfilling these needs yields the figure of $1,941,031, which plaintiff seeks to have deducted from the valuation of its property.

In addition to defending its own item-by-item approach, the defendant attacked the validity of the plaintiff's model on two levels. First, defendant sought

to demonstrate through the testimony of Paul B. Sagar, supervisor of the Industrial Section of the Department of Revenue,[6] that the type of cost data used by plaintiff in its calculation was inappropriate to the comparative cost approach to functional obsolescence. Secondly, the feasibility of the model plant was attacked in detail through the testimony of Mr. Leo Bruss, of the Multnomah County Appraiser's Office, who was assigned to examine the original appraisal for purposes of this litigation.

In essence, the Tax Court completely rejected the position and evidence of plaintiff and completely accepted the position and evidence of defendant.

■■ Because we sit as a court of equity on appeals from the Tax Court,[7] we must review the record de novo.[8] In making this review we are instructed by statute (ORS 305.427) that:

> "In all proceedings before the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief and the burden of going forward with the evidence shall shift as in other civil litigation."[9]

As in ordinary civil litigation, when the party bearing the burden of proof introduces sufficient evidence to make out a prima facie showing on a particular phase of his case, the burden of going forward shifts to his opponent.

---

[6] Mr. Sagar was one of the authors of the *Industrial Appraisal Manual,* cited n. 4 *supra.*

[7] ORS 305.445.

[8] ORS 19.125 (3).

[9] *See* J. R. Widmer, Inc. v. Department of Revenue, 261 Or 371, 494 P2d 854 (1972).

■ We take this to mean in practical terms that the Department of Revenue initially need show nothing to justify its assessment or the method by which it was derived. However, once the taxpayer has introduced substantial evidence tending to show a value of the property different from that asserted by the assessor, the burden of going forward shifts to the Department of Revenue to refute this showing without the benefit of any presumption different from that accorded to an ordinary civil litigant who has the advantage of the burden of proof.[10]

■ In this light, we find that plaintiff introduced sufficient evidence to support a valuation substantially less than the assessed value of the subject property. Plaintiff introduced testimony of fully qualified expert appraisers that the assessor's valuation of individual items had been spot checked and found to represent accurately the replacement or reproduction[11] cost of the items checked depreciated to reflect normal depreciation. It introduced, through testimony of those familiar with the plant, the misalignment of the facility and the adverse effects of the stream and streets. Next, it introduced the Collinson model, partially through the former testimony of its deceased creator,[12] and partially through the testi-

---

[10] *Id.*

[11] "Reproduction cost is the present cost of reproducing the improvement with one of an exact or highly similar material. Replacement cost is the present cost of replacing the improvement with one having the same utility." Appraisal of Real Estate, 180. In the original appraisal, upon which plaintiff's assessment is based, reproduction cost was apparently used except in the case of relative new equipment for which the two costs would be identical. The significance of the distinction will be discussed more fully later in the opinion.

[12] This testimony was admitted by stipulation of the parties.

mony of Willis Parnell, a management consultant brought in to evaluate and present the model after Mr. Collinson's death. Mr. Parnell vouched for the accuracy of the model and its underlying assumptions with some minor exceptions to be discussed below. Finally, plaintiff introduced the computations necessary to convert the differences into a value of functional obsolescence through the testimony of an expert appraiser. This result was the nearly two million dollar figure mentioned at the outset.

At this state in the proceedings, it seems clear that plaintiff succeeded in shifting the burden of going forward to the defendant. Plaintiff had presented a plausible computation directly tied to that which was to be estimated excess operating costs. Assuming the Tax Court accepted all facets of plaintiff's expert testimony, there is room for little doubt that the plaintiff should have prevailed had the case ended there.

Defendant sought to meet its burden of going forward in three ways. First, it introduced the testimony of Mr. Sagar that because the cost values used in the calculations had been reproduction costs and not replacement costs,[19] the calculations were invalid. The essence of this point seems to be that the use of reproduction costs does not reflect the true value as seen by prospective buyers who are interested in the relative costs of productive capacity and not in the costs of reproducing an old plant in its obsolete form. In Mr. Sagar's own words:

"* * * "[I]n order to measure functional obsolescence, what you have to do is to measure—measure the difference between the modern counterpart plant and the old plant in their ability—economic

[19] See note 11 *supra*.

ability to perform and you can't do it by reproducing an old plant. In other words, comparing one old plant with another old plant doesn't produce any means of measurement at all, at least as I see the problem. For that reason, I don't think it's possible to work out reproduction cost and then say that we'll take excess operating costs from it because the excess operating costs have been created by the new plant so it has become the standard of comparison and it's from this that you have to take your—your—or measure—all your measurements are from replacement cost new. Reproduction cost has nothing to do with it because it's the replacement cost trend that's created the problem that you're trying to define and measure.

"Q Now, when a fee appraiser goes in today, in your experience, doesn't he ordinarily start with replacement cost new?

"A I think replacement cost new is something that's—is coming. It's the wave of the future but it hasn't arrived * * *"

The preferable way to perform the comparison attempted by plaintiff would be to compare the present plant and the model plant both valued at replacement cost new. However, the law does not require perfection of the taxing authority and should not require it of the taxpayer. The goal is not theoretical purity but the proper estimate of fair market value. Beginning with that premise, our inquiry must be directed to plaintiff's evidence purporting to show that the value of the subject property is less than that found by the assessor. All evidence, including direct testimony on this point, indicates that because the bulk of the components of the plant were relatively new on

the assessment date, reproduction and replacement costs were not significantly different.[14]

The second line of defense directed at the specificity of plaintiff's calculations was the argument that appraisal is not susceptible to neat calculations but must be the product of the informed judgment of an expert. It must be admitted that the calculation of obsolescence cannot be made with sharp precision.[15] But this is not to say that as much precision as is possible should not be sought by isolating the factors affecting value. In this case, it is admitted that the plant is not laid out optimally and because it is not this reduces its fair market value to the extent that a buyer would perceive excess costs of production over his alternative of constructing a new plant laid out to allow the most efficient operation. Therefore, *explicit* reference to the excess operating costs apparently involved would seem to be a significant ingredient in attempting to come as close as possible to a fair estimate of special functional obsolescence.

To resort solely to a general impression of the

---

[14] This evidence is backed up by the fact that plaintiff's experts apparently did not realize until the time of trial in the Tax Court that the values of individual items obtained from the county assessor's appraisal report and used in plaintiff's analysis were not replacement costs even though they had verified the more important of these values themselves. Moreover, it appears that the assessor's office was itself confused as to which values it used since one of its agents testifed before the Department of Revenue that they were replacement costs but changed his testimony before the Tax Court. It is noteworthy that the assessor's forms introduced into evidence by the defendant have a column labeled "REPL. VALUE."

[15] See Appraisal of Real Estate, p. 62:

"But physical depreciation and functional obsolescence cannot be measured precisely as a physical object can be measured. Its measurement—or better, its estimate—depends largely on the experience and judgment of the appraiser."

magnitude of the obsolescence, as defendant purports to do, puts the taxpayer in a position where he is left only with a similarly abstract and vague contradiction to carry his burden of proof. It is not likely that the burden could be met under this kind of handicap. Moreover, there would be little room for judicial review.

■ Plaintiff's approach, although admittedly dependent upon factors of judgment as to how much equipment and how many man hours can be saved by a realignment of the facility, nevertheless provides a more specific framework for evaluation by focusing upon the specific items involved in the operation of the plant and the costs which are attributable to them. Thus, plaintiff provides a method of determining the value for functional obsolescence which is tied to its admitted effect. That the county assessor arrived at a different figure by increasing depreciation values a little without attempting to identify the specific factors which would affect operating costs is not a showing sufficient to destroy plaintiff's position.

When defendant fought plaintiff on its own battleground and attempted to counter plaintiff's specific evidence of excess equipment and man hours needed because of the poor alignment of facilities, defendant was not able to support its contention that the obsolescence did not exceed 5%, even granting defendant every disputed item of equipment and man hours in the calculation. Accepting Mr. Bruss' assertion that there is no excess equipment, his most conservative assessment of the manning requirements of the present plants, and his most expansive assessment of the manning needs of the model plant, one finds a capitalized

value of excess costs of more than $650,000.[10] The assessor testified that he had allowed for obsolescence by depreciating each component of the plant a little extra and that the cumulative effect of this was perhaps 5% of the value.[11] Assuming this to be accurate, the assessor's allowance would amount to only $352,-308, slightly more than one-half of that which the record supports at the very least.

■ It appears, then, that even by the most conservative estimate the plaintiff has carried its burden to show a lower value than that found by the defendant and accepted below. It is not incumbent on the taxpayer to prove all of its proposed change to prevail. He must do no more than show that a reduction is appropriate and furnish the court with information sufficient to calculate the reduction proved to be in order.

Accepting, as we have, that plaintiff has adequately met its burden of showing an excessive assessment, we therefore turn to determination of the appropriate reduction.[12] This requires an analysis of the evidence of excess operating costs on both equipment and labor.

■ In its calculation of excess operating costs attributable to equipment plaintiff contended for a reduction of straddle carriers from nine to four in the model

---

[10] This figure is obtained by totalling those personnel reductions criticized by defendant's expert (30) and subtracting this figure from the 50 claimed by plaintiff yielding admitted savings of 20 positions. Multiplying this times annual labor cost and capitalizing at 11% with allowance for corporate income taxation yields $657,280.

[11] The record is not clear whether this is 5% of the value of improvements or of the entire assessment includng the land. We accept the former view maximizing the allowance.

[12] It should be noted that this court has "the power to affirm, modify or reverse the order or decision of the tax court appealed from, with or without remanding the case for further hearing, as justice may require." ORS 305.445.

plant. Defendant presented expert testimony that the current use of nine such vehicles is not justified and the proposed reduction is attributable to improved management rather than realignment.[19] The primary basis for this assertion is the fact that Collinson's manning tables show a maximum of four carrier drivers on any one shift which, it is argued, implies that five are needed to allow one spare and four are excess. Plaintiff's response to this was that the manning and equipment tables are not supposed to match each other exactly and that some machines are needed to allow for "surge" needs and shift overlaps. Although this is fully plausible as a general premise, plaintiff did not endeavor to justify a total of nine carriers as opposed to seven or eight. In light of the burden of proof on plaintiff, we must hold that it has inadequately supported its position in this instance. We are of the opinion, however, that the testimony adequately supports a current need of six carriers[20] yielding an excess of one over the undisputed hypothetical need of five.

Defendant's expert also criticized the current need for fork lift trucks asserted by plaintiff. In this regard, however, he was merely exercising an apparently automatic reduction to one machine in excess of the scheduled staffing. We find no support here for disbelieving plaintiff's justification of its current need

---

[19] See Industrial Appraisal Manual, 61: "* * * Care must be taken to note that sometimes management knowingly carries on certain excess costs due to lethargy in correcting the problem or management may carry excessive maintenance personnel to accommodate senior or handicapped employees who have earned special consideration. These latter circumstances should not be considered as a 'penalty' against the value of the property."

[20] Defendant's expert testimony supporting the reduction in current needs was based on a post valuation shift from nine to six machines. His further unsupported contention for one spare was simply speculation.

and therefore accept its showing of an excess of two due to extra handling because of misalignment.

The third type of excess equipment argued for is log tractors and trailers. Defendant agreed that elimination of the bisecting public streets would eliminate the need for all such equipment currently needed. Defendant argued, however, that two trailers were current excess because there were only four tractors but six trailers: "* * * You can't use a log trailer without a log truck to begin with * * *." The evidence is clear, however, that the trucks were engaged in a short-haul, shuttle operation in which one might very well use a trailer without a tractor often enough to justify the expense of keeping it. Defendant's additional argument that only three tractors were justified is not supported by any reason. We find that plaintiff has met its burden as to the total number of trucks and trailers claimed.

On the fourth item, yard cranes, plaintiff was not as convincing. The Collinson report as presented and adopted by Mr. Parnell eliminated all cranes but retained a position for crane operator on one shift. Although it is possible that the position "crane operator" was misnamed, this explanation was not put forward. We therefore find that the model plan should be charged with the addition of one yard crane as defendant contended. Making this correction to Mr. Collinson's otherwise undisputed tables yields an annual excess operating expense in terms of equipment of $52,540.

■ The second division of excess cost is the extra manpower needs required for additional materials handling and staffing inefficiencies inherent in the

current misalignment. This extra cost figure is obtained by comparison of "manning tables" for the real plant with similar tables for the hypothetical plant. The Collinson calculation produced a differential of 50 positions between the model and existing plant. As noted above, this was disputed in many instances and consequently a detailed examination of the evidence is necessary. Plaintiff's evidence was primarily a detailed presentation of Mr. Collinson's manning tables with explanation by Mr. Parnell who had re-examined the underlying data. Mr. Parnell affirmed the overall accuracy of the final conclusions with the caveat that he found them somewhat conservative in the degree of difference between the two plants. He was unable, however, to obtain data to verify Mr. Collinson's findings in two significant instances. Mr. Collinson had determined that staffing needs in the hypothetical plant's plywood maintenance department would be ten men as opposed to twelve then employed in the real plant. Similarly, he determined that the plywood manufacture department exhibited an excess of seven employees due to misalignment. Because of change in the mill's product line and production levels subsequent to Mr. Collinson's study, Mr. Parnell was unable to verify these calculations. We are, therefore, forced to reject this total finding of nine excess positions as insufficiently supported.

█ In one additional area the plaintiff's case was insufficient. Mr. Collinson had found a net hypothetical reduction of fourteen positions in loghandling due to relocation and shift from partial pond storage to complete cold-decking in one location. Although the bulk of this change was not seriously disputed by defendant, Mr. Bruss argued persuasively that the under-

lying assumption that two men could scale, sort, and deck a load of logs every six minutes required at peak operating times was unrealistic. Although we are not capable of determining the feasibility of this assumption, we are of the opinion that plaintiff's failure to meet this criticism requires us to accept Mr. Bruss' contention that the model plan staffing is over-idealistic in this regard. We are also of the opinion that an addition of one to the model plant's cold-decking crew is fully sufficient to answer Mr. Bruss' criticism.

■ It is by no means impossible that if plaintiff had had the benefit of Mr. Collinson's testimony, it might have been able to prevail on these issues. As we have emphasized throughout, however, the burden of proof is on plaintiff on all issues in the case. This necessarily includes the burden of persuading the court of the details of its contentions when they are challenged by the defendant. Adoption of the report of one expert by another is insufficient to carry this burden, especially in cases such as this where it is so easy to hide self-serving assumptions behind the facade of numbers. To prevail in such a case the plaintiff must be prepared to reveal its underlying assumptions and data and defend them effectively.[20]

■ As to the remainder of the manning table analysis, however, we find that plaintiff has met its burden of proof. Mr. Collinson's findings were not simply stated by Mr. Parnell but were adequately explained and justified on the basis of Mr. Parnell's own experience and observation. Mr. Bruss disputed a portion of the conclusions but his criticisms were in the form of his inability to see how the hypothetical staffing would be

---

[20] See **Chicago and North Western Railway v. Hillyard**, 502 P2d 189, 191 (Wyo 1972).

possible. He did not address this criticism to the fully plausible explanations given by Mr. Parnell, and in a number of instances disclaimed any expertise in the specific production processes under discussion.[22]

12. We hold, therefore, that plaintiff has demonstrated an excess labor cost of 40 positions rather than the 50 claimed. The annual dollar cost of these positions as of the assessment date was $464,000.[23] Adding this

---

[22] Although there is no value in considering each of these instances, an example may clarify our finding. Mr. Parnell justified the hypothetical labor savings in lumber shipping as the product of reducing the number of shipping points from four to one. His explanation was as follows:

"Well, they have—they have three—four shipping points at the present time, all relatively removed from each other, and you can't use half a man at one point when he happens to be free at another point because this leaves his crew partner without a working partner and a scattered shipping department is an extremely inefficient facility but, in view of the volume of product moving and the limited area from which to move it, why there isn't really any alternative but to do it the way they're doing it at the present time. However, on a realigned facility, with adequate space, I feel they could effect these efficiencies in number of people required to do the job, as well as cut down the—the machine drivers, the forklift and carrier drivers."

Mr. Bruss ignored this explanation and stated that "* * * the quantities of material handled and are to continue handled in the same manner, the difference that could be achieved in the realignment plant, as I stated before, you have to pick a package up and you have to set it down, would be the difference of the distance traveled between the finished product area as it is now and the finished products area as it would be with the [re]alignment * * *. So I'm not stating that it can't be done with this 10 men, but I am stating that there has to be an element of doubt somewhere here when you have 18 men down to 10 men handling the same volume of material."

[23] $11,600 (annual labor cost) × 40 (positions) = $464,000. This represents wages, payroll taxes, and fringe benefits. Plaintiff assumed 11% overtime in this calculation and its manning tables. We have rounded plaintiff's undisputed figure of $11,604.90.

figure to the previously determined excess equipment costs of $52,540, yields a total annual excess of $516,-540. To determine the effect upon a rational and informed prospective buyer one must compute the present value of this annual cost by capitalizing the after tax difference at the appropriate interest rate.[24] The result of this simple calculation is a total value of $1,399,306.86, which may reasonably be rounded to $1,399,000.[25] This value must be deducted from the value of the property determined by summation of the costs of its parts without consideration of functional obsolescence due to misalignment to yield a value of $6,468,718.[26] We hold that the foregoing amount is the fair market value of the subject property on January 1, 1971, as shown by the evidence in this case.

This holding does not constitute the rule that the methods used to determine functional obsolescence in this case are necessary or appropriate in all cases as a matter of law. It may be that other and better methods are available or will be developed in the future. It might even be that a different record will show the method approved to day is subject to significant inadequacies. Nor should this opinion be taken to stand for the principle that a rough estimate of obsolescence registered in an assessment item-by-item can never be

---

[24] Plaintiff derived the rate of 11% by reference to historical rates of return in the wood products industry. Defendant did not dispute this rate. Taking corporate taxation into account yields a present value multiplier of 2.709.

[25] $516,540 × 2.709 = $1,399,306.86.

[26] $7,867,718 — 1,399,000 = $6,468,718. The figure $7,867,718 represents the defendant's assessment plus the 5% allowance the assessor is said to have made.

sustained.[20]  We hold, merely, that on the record before us the plaintiff is entitled to an adjustment in the amount stated above.

Reversed.

---

[20] We do think that judicial treatment of disputes such as this one might be facilitated by a clearer presentation of the assessor's thinking embodied in a discernible allowance for factors which can be separated.