# IN THE OREGON TAX COURT

## LEBOW
*v.*
## DEPARTMENT OF REVENUE
## CHAMPION INTERNATIONAL, INC.,
*Intervenor*
(TC 2171)

Allison E. Smith, Deputy District Attorney, Linn County, Albany, represented plaintiff.

James C. Wallace, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Richard A. Hayden, Portland, represented intervenor.

Decision partly for plaintiff and partly for defendant rendered April 18, 1985.

**CARL N. BYERS, Judge.**

Plaintiff is the county assessor appealing from an adverse order of the Department of Revenue. Intervenor (hereafter "Champion") is the property owner which is seeking to maintain the value determined by the Department of Revenue.

## SUBJECT PROPERTY

The property in question is a wood products manufacturing facility located in Lebanon, Oregon, covering 138 acres. Its major components consist of a plywood plant, a hardboard plant, a custom premanufacturing and prefinishing plant and a laminating plant. Associated with these major components are their necessary support facilities such as offices, power plant, storage and parking.

The plywood plant, which constitutes the largest single component, was originally constructed in 1940 with additions and modifications in 1966 and 1972. The hardboard plant was added in phases between 1951 and 1966 and the custom plant in 1946 through 1960. The office building was initially constructed in 1941 with a large addition in 1951 and the product finishing plant was basically established in 1963-64. This progressive growth of the facilities has resulted in a mixture of old and new in buildings and machinery and equipment. For example, the plywood plant still utilizes a 12-foot lathe which was apparently manufactured in 1937. Although somewhat oversized for the timber available today, it is still functional. On the other hand, Champion's real property returns for the period 1971 through 1981 show additions of $7,480,201. While this may include some removal or tearout costs, it is indicative of efforts to update or improve the plant.

## THE APPRAISAL APPROACHES

The approaches taken by the appraisers for each side are similar. Both appraisers used teams of individuals to assist them in gathering the information and in making the numerous calculations necessary. While there were some other wood products facilities offered for sale as of the assessment date in question, neither appraiser found any comparable sales to support utilization of the market data approach. The capitalized or income approach was considered by both

appraisers; the county appraiser accorded it a five percent weight based on his projected profit and Champion's appraiser discarded it because of projected losses. As a result, both appraisal teams relied primarily upon the cost approach to value.

The appraisal teams utilized three versions of the cost approach. A brief description of these three versions will be helpful in understanding the positions of the parties. The three versions are:

(a) *Reproduction cost new* which calculates the cost of reproducing the subject property exactly as is new and then deducts from that cost physical depreciation, functional and economic obsolescence, if applicable;

(b) *Replacement cost new* which calculates the cost of obtaining property to perform the same function and then deducts physical depreciation and economic obsolescence if applicable; and

(c) *Replacement cost used* which calculates the cost of obtaining used or "secondhand" property to perform the same function and then deducts functional and economic obsolescence if applicable. It should be noted that this method is used primarily to appraise industrial machinery and equipment which, because of its nature and attachment to real property, is appraised as real property. Also, while this method assumes the creation of a comparable facility out of *used* equipment, the installation costs, the wiring, plumbing, foundations, structural supports and other similar parts must be created out of new materials. These new costs only are then depreciated in a manner similar to that of depreciating a totally new plant (as in the reproduction cost new approach).

In this case, the county appraisers utilized both the reproduction cost new and the replacement cost used approaches in valuing both the buildings and structures and the machinery and equipment. In the reconciliation process, the county relied 60 percent on the reproduction cost new approach, 35 percent on the replacement cost used approach and 5 percent on the income approach. Champion's appraisers utilized the replacement cost new approach on the buildings and structures and a replacement cost used approach for machinery and equipment.

## BUILDINGS AND STRUCTURES

With regard to the buildings and structures, the county had two witnesses, one of whom utilized the reproduction cost new approach to find a value of $3,180,500 (including yard improvements) (Plaintiff's Exhibit 6-A) and one of whom utilized the replacement cost used approach to find a value of $3,783,290. The county's replacement cost used approach was based primarily on values established by the auction of buildings at Bly, Oregon. Champion's witness utilized a replacement cost new approach to find a value of $2,685,312.

Both parties were generally in agreement that the subject buildings are, for the most part, older, some in poor physical condition, and suffering from substantial functional obsolescence. In evaluating the evidence as to the buildings and structures, the reproduction cost new approach appears to be the most reliable. That approach is based on the buildings as they actually exist, deducting from their cost new the depreciation due to physical condition and functional inutility. Based on the evidence adduced by the parties in this case, this approach was more persuasive than the other two. Champion's appraiser estimated the cost of new buildings of different sizes and materials and then applied a depreciation factor. His estimates of possible replacement buildings, with their necessary heating, lighting, wiring and other components was less related to the realities of the existing plant and less persuasive as to the value of the subject buildings and structures. The same may be said of the county's replacement cost used approach.

## THE USED EQUIPMENT MARKET

In valuing the machinery and equipment, much of the disagreement between the parties arises over the use of prices from the used equipment market. Two county witnesses, including the supervisor of the Appraisal and Assessment Division of the Department of Revenue, testified that the used equipment market was not adequate to permit use of the replacement cost used approach. They indicated that, based on the surveys and investigation of the Department of Revenue, there was not enough used equipment available in the market to build another complete plant. Another of the county's appraisers utilized the replacement cost used

approach as a check on his reproduction cost new approach for the plywood plant. In his testimony he indicated that some equipment was available but he had reservations as to whether all of the equipment was available. On the other hand, Champion's primary witness, who used the replacement cost used approach, testified that there was unquestionably sufficient used equipment available in the market to permit its use. He testified that companies such as Champion sell and purchase used equipment from each other and from the marketplace.

All of the cost approaches to value are based on the principle of substitution.

> *"The principle of substitution holds that when several commodities or services with substantially the same utility are available, the one with the lowest price attracts the greatest demand and the widest distribution."* American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 33 (7th ed 1978).

When related to the cost approach, the principle of substitution merely says that no one will pay more for a property than it would cost to create a similar property without undue delay. Applying this principle here, the logic of the replacement cost used approach is that a prospective purchaser would not pay more for the subject property than it would cost him to create a wood products manufacturing facility of equal desirability and utility out of used equipment. To do this, there must be enough used equipment available for the individual to create the "replacement cost used" plant.

The court finds that there was sufficient used equipment available in the market. The evidence established that there is a recognized used equipment market for wood products machinery and equipment. It is also clear that as of the assessment date in question the industry was in a state of recession. A number of wood products facilities had closed and their machinery and equipment was being offered for sale basically at used equipment prices. Champion introduced evidence of plywood plants that were offered for sale. For example, the Willamina Plywood Plant, first constructed in 1939, was offered for sale in 1980 for $1,500,000. The owners had invested $1,665,000 in improvements or additions during the period 1976 through 1979. Although somewhat smaller than the subject plywood facility, the machinery and equipment

was comparable and could have been purchased by someone to create a competing facility. Likewise, the Publishers Paper facility at Anacortes, Washington, also built in 1939, was offered for sale in 1981 at $3,500,000. This evidence, and evidence of other wood products facilities, proved that there was not only an established used equipment market but whole facilities which could be purchased for substantial discounts.[1]

## THE REPLACEMENT COST USED APPROACH

Finding that there was adequate used equipment available to permit use of the replacement cost used approach does not, however, end the inquiry. It is undisputed that in creating a comparable facility utilizing used equipment it would nevertheless be necessary to use some things new. For example, concrete foundations for the equipment, structural steel supports, bridgeways, wiring and piping might well be all new. A question which was not addressed by either appraiser is whether the hypothetical buyer or market would in fact use this admixture of used equipment and new support facilities to create a competing facility. Or to phrase the question another way, is the difference between the cost of new machinery and the cost of used machinery so great and the difference in functional efficiency and life expectancy so little that the economic force would motivate someone to create a plant out of used equipment? There was no evidence submitted by either party to answer this question. There was some evidence that there had been no new plants built on the West Coast since 1975. There was also some evidence that big, as well as small, plants use used equipment, particularly in hard times in the industry. Perhaps the most persuasive evidence supporting the used equipment approach is the number of plant closures and offerings for sale at the time in question. It is highly unlikely that a prospective purchaser would construct either a reproduction of the subject property utilizing new equipment or a replacement plant utilizing used equipment. It is far more likely that a real buyer would simply purchase one of the existing facilities. This being the case, it would appear that the

---

[1] It should be noted that the sale prices of these facilities such as the Willamina plant, all of which occurred after the assessment date in question, are not being considered by the court. The court is simply looking to the offering price as of the assessment date in question as an indication that these facilities could have been purchased for their offered prices.

replacement cost used approach would have as much validity as the reproduction cost new approach for the purpose of valuing the subject property.

## THE COUNTY MACHINERY AND EQUIPMENT APPRAISALS

As previously noted, the county's witness utilized the replacement cost used approach as well as the reproduction cost new approach. However, the county's use of this approach is subject to serious question on two grounds. First, only the machinery and equipment in the plywood plant was based on used equipment prices. All of the remaining machinery and equipment was valued simply by trending up the county's 1978 values. Thus, the appraisal hardly qualifies as a replacement cost used appraisal. Second, it appears that the county's view as to what equipment was available influenced its basic cost estimates. For example, on cross-examination, it was disclosed that while all of the seven veneer dryers in the plywood plant were virtually alike (No. 4 being somewhat less desirable than the other six), the used cost estimates ranged from $75,000 to $225,000 per dryer. More to the point, dryer No. 3, valued at $75,000, was admittedly better than dryer No. 4, which was valued at $216,000. This incongruous approach appears to result from the county's view that there was not enough used equipment available.

When asked on cross-examination why the actual used dryer prices were less than the depreciated cost of new dryers, the county's appraiser agreed that trending factors should not be applied to reproduction cost to get new reproduction costs. The same witness also testified that used equipment was more expensive to install than new equipment. However, the costs applied by him in his field notes were to the contrary. Again, cross-examination revealed that the use of cost factor books for installation of equipment may result in higher estimated costs than those quoted by companies who install new and used equipment.

Several additional questions can be raised concerning the county's reproduction cost new appraisal of the machinery and equipment. While the appraisers utilized the Department of Revenue's cost library and sought current prices from manufacturers, it appears that a substantial portion of the appraisal is based on 1972 prices trended to 1982. The 1972

costs were trended to 1978, generally by a factor ranging from 1.64 to 1.75, depending upon the particular equipment or machinery involved. The 1978 reproduction cost thus obtained was then again trended by a factor generally of 1.49 to obtain a 1982 reproduction cost. The county's witnesses believed that this method was accurate and is verified by current price request on certain pieces of equipment. Champion challenged the use of the method because the trending factors are based on national figures which do not account for the variances in regional economic circumstances. For example, if one area is flourishing and another area is in a state of recession, the average economic indicators will not accurately reflect either region. The county's response to this is that the prices for machinery and equipment between the various regions do not vary more than 10 percent. However, Champion introduced evidence tending to establish that rather than prices increasing 49 percent between 1978 and 1982 machinery prices had in fact declined.[2]

## CHAMPION'S MACHINERY AND EQUIPMENT APPRAISAL

The county criticizes Champion's machinery and equipment appraisal on the grounds that its appraiser failed to include sufficient concrete, metal and other installation property and failed to use market costs. For example, Champion's appraiser used eight cents a pound for structural steel when the county's steel price survey indicated such prices were running at 25 to 75 cents a pound. (Plaintiff's Exhibit 41.) Based on the county's rebuttal evidence, it would appear that Champion's appraiser may not have included adequate costs and adequate amounts of concrete or structural steel. It is regrettable that such challenges were not made at a point in the proceedings when Champion's appraiser could respond to them. Challenges which were made during cross-examination were fended in a logical and knowledgeable manner.

Champion's appraisal is not without additional questions. As pointed out by the county witnesses, Champion's depreciated reproduction or replacement cost used may be

---

[2] Champion's Exhibit I, a letter in response to the appraiser's inquiry concerning equipment prices, indicates that prices declined 12 percent between 1980 and 1981 and were flat or stayed the same from 1981 to 1982.

anywhere from $474,250 to $816,890 low by reason of failure to include engineering fees. These may have been excluded on the theory that engineering is 100 percent obsolete in the current plant, but using the replacement cost used approach requires them to be included. On the other hand, there is some evidence that Champion's appraiser included an engineering element in his basic labor rate for installation.

■      The county alleges that Champion left out the waste wood system which the real property returns indicate had a total cost of $767,108. While the court is unable to find any specific waste wood system in Champion's appraiser's field notes, the county appraisers likewise provided no identification of this system. The waste wood system, if it exists as such, appears to be found in the county's appraisal only by virtue of "additions" taken from the real property returns, trended up. Consequently, the court is left with an uneasy sense that Champion's appraisal may be deficient but finds itself unable to ascertain exactly how much. Finally, on rebuttal, one county appraiser testified that Champion's appraisal was missing significant installation costs in the form of concrete foundations for the used equipment. One of the items pointed to specifically was the need for concrete foundation for the hog shown on page 19 of Exhibit B. However, Champion's undepreciated installation cost for that item appears to be $17,910 compared with the county's installation costs of $12,230 for the same item. Because of the way the field notes and the appraisals are arranged, the court is unable to compare the county's total installation cost with Champion's total installation cost in the replacement cost used approach for the plywood plant.[3]

---

[3] The court might undertake such an arduous time-consuming task except for the fact that the county's field notes are in deplorable condition and can be comprehended only after much scrutiny and with some explanation. The court has attempted to consider a comparison from this point of view: In Exhibit 44, the county divided Champion's depreciated replacement cost used value by .30, which is the standard depreciation "good" used by Mr. Granvall, to obtain an estimated total cost prior to reproduction. If this method is used on Mr. Granvall's replacement cost used value for the plywood plant only and then compared with Mr. Sendelbach's replacement cost used for the plywood plant only, the difference in total cost is approximately $3 million. It would appear that, on the whole, Sendelbach's used equipment prices are substantially higher than Mr. Granvall's. For example, Mr. Sendelbach has a total of $1,171,000 higher costs than Mr. Granvall for the six presses, seven dryers and two lathes. If this is true, it would appear that most of the difference between the two appraisals is not in the lack of engineering cost, missing concrete or missing waste wood system but in the used equipment prices utilized by the two appraisers.

## THE APPRAISERS' PERSPECTIVE

In attempting to view the parties' respective positions in perspective, it is clear that the county appraiser has a far more optimistic view of the subject property than Champion's appraiser. This is apparent from the way the two appraisers considered the income approach. The county appraiser used an "average" of the subject property's earnings between 1978 and 1981 to project the income for the future. On this basis he concluded that the property would continue to realize profits in the future and found an estimated value of $15,729,960. Champion's appraiser, on the other hand, discerned that there was a downward trend which, when projected, resulted in a "salvage value" only for the plant. In weighing these two approaches, the court must place itself in the position of a prospective purchaser as of January 1, 1982. The question might be, "What would the knowledgeable buyer know and therefore discern as to the income potential of the property as of the assessment date in question?" As the evidence shows, it was known that stumpage prices were up, fuel prices were up, labor costs were up, while housing starts were down, prices were down (due to Canadian competition), and the lumber market was down. As shown by the county's own Exhibit No. 38, between 1979 and 1981, 32 wood products facilities had closed in Oregon. During the same period from 1979 through 1981, the county's evidence indicates there was a 37 percent decrease in production. In light of this evidence, the court finds that the prospective purchaser would have discerned the downward trend in income and would not have used the projected income adopted by the county appraiser. Use of the average income from 1978 to 1981 assumes a short down and up cycle in the industry with no change in the basic circumstances. The evidence was to the contrary.

## FUNCTIONAL OBSOLESCENCE

After evaluating the weaknesses and strengths of the appraisals for the machinery and equipment, the court finds that Champion's replacement cost used appraisal appears to be the most reliable with one exception. After arriving at an estimate of replacement cost used for the machinery and equipment and the buildings, the appraiser applied a deduction for special functional obsolescence. The appraiser perceived functional obsolescence in three specific areas:

(a)   In block handling, that is, the movement of blocks or short logs from the debarker to the lathe. He concluded that because there was no visual connection, two extra men were required. However, there was evidence that new plants would be built this way. The court is unpersuaded that such labor is excess.

(b)   Champion's appraiser claimed that the material flow was poor and required additional manpower. His rationale was that because the plant had to purchase its veneer and was not able to produce enough of its own, extra men were required to move the purchased veneer around. Also, because the boiler couldn't produce enough power, the plant had to purchase 50 percent of its power. Finally, the specialty plywood required extra manpower to move panels. While these observations might well be accurate, they were general and unsupported by the specifics and measurements required to sustain a deduction for functional obsolescence.

■      (c)   Champion's appraiser also perceived curable functional obsolescence in the lay-up and press line. He proposed to replace the six presses with three used 40-opening automatic feed presses. The net savings from these presses constituted, in his opinion, functional obsolescence. Again, however, these conclusions were too general and not supported by specific measurements and facts. Deductions for functional obsolescence can only be allowed where they are clearly supported by specific measurable inutility. *Publishers Paper Co. v. Dept. of Rev.,* 270 Or 737, 530 P2d 88 (1974).

Based on the above conclusions, the court finds that the true cash value of the subject property as of January 1, 1982, was: Buildings and structures, $3,180,500; machinery and equipment, $6,775,000.