# IN THE OREGON TAX COURT

## AGRIPAC, INC.
*v.*
## DEPARTMENT OF REVENUE
(TC 2740)

James C. Griggs and Hunter B. Emerick, Harland, Ritter, Saalfeld, Griggs, Gorsuch & Alexander, Salem, represented plaintiff.

James C. Wallace and Joseph Laronge, Assistant Attorneys General, Tax Section, Department of Justice, Salem, represented defendant.

Decision, part for plaintiff and part for defendant, rendered June 1, 1990.

## CARL N. BYERS, Judge.

Plaintiff is an Oregon agricultural cooperative engaged in the business of food processing. It appeals the value of the improvements (buildings, structures, machinery and equipment) of its West Salem plant. It is not contesting the value of the land or personal property. In its Opinion and Order[1] defendant found the value of the improvements, as of January 1, 1983, and January 1, 1984, to be $12,663,409. In its complaint, plaintiff alleges that the value does not exceed $6,897,000 for either year.[2]

The plant, consisting of 25 main buildings, comprises "an integrated canned- and frozen-vegetable processing plant." It processes green beans, wax beans, corn, squash, onions and blackberries. The 1983 total output of finished product was 58,254,306 pounds. It also repackages frozen fruit and vegetables and provides frozen storage for all of plaintiff's plants.

By way of general observation, the industry has undergone several changes. A shift in public taste to frozen vegetables has resulted in more freezing and less canning. Plaintiff points out that approximately 24 percent of the canneries in California closed between 1973 and 1983. Eight major food processors have withdrawn from the vegetable and fruit processing industry.

Plaintiff's appraisers used all three approaches to value. However, the court has excluded plaintiff's cost approach from consideration. In that approach, plaintiff relied upon the appraisal work of another without ability to explain or supply the underlying data and rationale. *Publishers Paper Co. v. Dept. of Rev.,* 270 Or 737, 530 P2d 88 (1974). Plaintiff's market comparison approach gave an indicated value of $4,900,000 (including land). Its income approach gave an indicated value of $1,200,000 (including land). These indicators were reconciled in an opinion of value of $4,000,000 (excluding land).

---

[1] Opinion and Order Nos. 3-2370-27, 3-2371-27, 3-2372-27, 3-2373-27, 3-2374-27, 3-2375-27 and 84-5819.

[2] In its opening brief (after trial), plaintiff contends that the value was $3,100,000 for each of the years in issue.

Defendant's appraisers used the market comparison approach and the cost approach. They rejected the income approach as being unusable in these circumstances. Defendant's market comparison approach gave an indicated value of $9,600,000[3] (excluding land). Its cost approach gave an indicated value of $12,500,000.[4] These indicators were reconciled in an opinion of value for January 1, 1984, of $11,775,000 and $11,350,000 for January 1, 1983.

*Income Approach*

The subject property is only one of several plants operated by plaintiff. For lack of separate plant accounting, plaintiff had to estimate its total enterprise income. After determining the net present value of that income, it then allocated that value among its facilities.

Plaintiff's appraisers viewed the average income over a seven-year period as being representative of the estimated income for the plaintiff in the future. Their measure of income was earnings before depreciation, interest and taxes (EBDIT). The appraisers estimated the income at $2.2 million per year. They admitted this reflects "zero growth" in future income. They then divided this income by a capitalization rate of 31 percent. This gave them an indicated enterprise value of $7,171,449. From this, they deducted $3,510,970 for working capital, leaving $3,660,479 for all of plaintiff's tangible assets. Plaintiff's appraisers consider the subject property to constitute one-third of plaintiff's net tangible assets. Accordingly, they allocated one-third, or $1.2 million, to the subject property.

The court agrees with defendant that this approach gives implausible results. The $1.2 million allocated to the West Salem plant includes land and personal property which are not part of this appeal. The parties agree the land has a value of $900,000. That leaves only $300,000 for all of the buildings, structures, machinery and equipment and personal

---

[3] This is excluding comparable sale No. 4. If that sale is included, the indication of market value is $10,500,000.

[4] Some of defendant's cost indicators are a little confusing. On page 89 of defendant's appraisal report, the cost indicator of $12,464,590 does not include the land value. On page 33, defendant shows a value of $12,567,060 and then deducts $126,000 "economic obsolescence (due to land valuation)."

property. It is noteworthy that plaintiff invested $4.5 million in 1981 in just a portion of the bean line.

The court is uncertain where the problem lies with plaintiff's income approach. The error may be in assuming that the seven-year period used by plaintiff is a "cycle." Certainly the period of the economy in the early 1980s was not typical. In addition, plaintiff incurred some heavy capital expenditures which undoubtedly affected its earnings picture. The court is unconvinced that an average of the seven-year period plaintiff used is a good estimate of plaintiff's future income.

■ Further, plaintiff's measure of earnings is essentially gross cash flow. That measure reflects cash flows to both debt and equity. During the period involved, plaintiff had in excess of $12 million outstanding long-term debt. To conclude that the total enterprise has a value of $3.6 million is to ignore economic realities. Plaintiff's value by the income approach is inconsistent with its operations. The court does not see any way to adjust or view plaintiff's income approach to make it reasonable; therefore, it gives it no weight.

*Market Comparison Approach*

In the market comparison approach, plaintiff used eight sales from different parts of the nation. Two of the sales (Nos. 3 and 7) were of multiple plants, so the total number of plants considered was 19. Plaintiff adjusted each of the 19 plants for land, personal property, time, location, age, facilities and production capacity. Plaintiff's appraisers compared the plants on the basis of three relationships: (1) price to reproduction cost new, (2) price to production capacity, and (3) price to the number of square feet in the building floor area. They concluded "[t]hese three methods appear to be the best comparisons available in this case." In comparing the plants on the basis of production capacity to price, they performed a regression analysis, deriving an $r^2$ of 92 percent. This indicated a very high correlation between production capacity and price. Consequently, the appraisers concluded that production capacity "is a good predictor of purchase price." As a result, plaintiff relied upon the market comparison approach as its primary indicator of value.

Defendant challenged plaintiff's findings. It showed that plaintiff had made a number of errors in its production capacity figures for the comparable sales. Plaintiff now concedes most of those errors. Nevertheless, plaintiff contends that even with the corrections, its conclusions were valid. Recalculating the regression analysis using the corrected figures, plaintiff found a new $r^2$ of 89 percent.

Plaintiff requests the court take judicial notice of the formulas and calculation of the new $r^2$. The court declines plaintiff's invitation. It believes plaintiff's analysis is flawed even if the statistical calculation is correct. The court is not persuaded that production capacity is a good predictor of price. Plaintiff's own witness, Mr. Svoboda, testified there is not necessarily a "one-to-one relationship." Moreover, plaintiff's own adjustments for capacity varied significantly in dollar amount per ton. The court does not understand how an adjustment for capacity per ton can vary so widely if capacity is a predictor of price. Also, there are other variables besides production capacity which bear on the market price of a plant. If the court understands plaintiff's witness, Dr. Richards, omission of those other variables from the calculation affects the predictability.

After conceding the capacity corrections, plaintiff still uses the combined comparable sale No. 7 as a single sale in its corrected regression analysis. Use of that sale distorts the results. A simple comparison shows that the price paid per ton for the plants in that sale are not comparable.

| Sale No. | Capacity In Tons | Unadjusted Sale Price | Price Per Ton |
|---|---|---|---|
| 1 | 14,600 | $7,050,000 | $483 |
| 7D | 18,000 | 2,000,000 | 111 |
| 5 | 6,900 | 3,000,000 | 434 |
| 7F | 6,500 | 409,000 | 63 |
| 6 | 10,300 | 4,500,000 | 436 |
| 7B | 10,000 | 200,000 | 20 |
| 8 | 35,000 | 7,500,000 | 214 |
| 7C | 35,000 | 1,500,000 | 43 |

In making its analysis of the market comparison approach, plaintiff eliminated comparable sale Nos. 3C, 5, 7B

and 7F as "least meaningful." If not meaningful, one must ask why they are included in the regression analysis? The average price per ton for comparable sale Nos. 1, 4, 5, 6 and 8 was $364 per ton.

The average price per ton for sale No. 7, treating it as one sale, was $96 per ton. As defendant points out, if comparable sales Nos. 3 and 7 were left out of the regression analysis, the $r^2$ is reduced to 8 percent, a meaningless number.

The court also finds that plaintiff's adjustments to the comparable sales are less than persuasive. Plaintiff under-adjusted for buildings and failed to make any adjustment for repack facilities. Although plaintiff's appraiser claimed that he did make adjustments for repack capacity, it is clear to the court that he did not have enough information to do so. Plaintiff's appraisers adjusted 13 of the 19 separate plants downward. They adjusted the Woodburn plant, which sold for $7.5 million, to $4,219,152.[5]

Defendant's adjustments to its comparable sales are no more persuasive. Defendant adjusted for the differences in facilities by adding or subtracting on a reproduction-cost-new-less-depreciation basis. For example, comparable sale No. 1 was strictly a canning facility. Defendant adjusted that sale by adding for freezing, repack capacity and specific processing machinery and equipment.

■ Although defendant's approach may be reasonable, the court finds the results in this case are not. Sale No. 1, which sold for $5,300,000, was adjusted upward by defendant to $9,258,000. Likewise, sales 2, 3 and 5 were adjusted from $3.6 million, 3.6 million and $3 million to $9,588,000, $9,525,000 and $9,836,000, respectively. If such large adjustments are required, one must conclude that either the method is faulty or the plants are not truly comparable. Such large adjustments make any comparisons unreliable.

Defendant's comparable sale No. 4, the Woodburn plant, was considered by both parties to be the most comparable. The major dispute over this sale was the purchase price.

---

[5] Plaintiff calculates this to be 64.56 percent of the price. In fact, the correct percentage is only 56.25 percent.

Plaintiff bought the property from General Foods Corporation for a stated price of $7.5 million. However, the sale was subject to a supply agreement. Under the supply agreement, plaintiff was to furnish certain products to General Foods for five years. General Foods had an option to renew for an additional five-year period. Plaintiff also agreed to pass anticipated cost savings along to General Foods. General Foods agreed to pay plaintiff a fixed profit margin on the products supplied.

Defendant viewed the cost savings passed on to plaintiff as "giving up additional profit." Defendant calculated the cost savings and discounted them to a net present value of approximately $10 million. By adding that net present value to the $7.5 million purchase price, defendant concluded the true purchase price of comparable sale No. 4 was $18.3 million.

Defendant's analysis hangs suspended by wires of assumption. Defendant assumed that the supply agreement was comparable to the market. It submitted no evidence in support of that assumption. Defendant also assumed that plaintiff could have sold its products on the market to others. It submitted no evidence in support of that assumption. Without such evidence, defendant's analysis lacks a foundation to support the value determination.

To attribute any negative or positive value to the supply agreement, one must first know whether plaintiff could sell its product at a profit to others. Defendant did not make any comparisons in the marketplace. It did not even attempt to determine if the supply agreement had a positive value to plaintiff. Since General Foods viewed it as having a negative value, it very likely could have an overall positive value to plaintiff. In view of this, the court cannot find that passing cost savings to General Foods was a penalty or an additional price plaintiff had to pay for the plant.

Although the products to be supplied were not limited to the Woodburn plant (they could be supplied by any of plaintiff's other plants), the agreement was clearly a condition of the sale. Unless the positive or negative value of the supply agreement is fixed, the sales price of the plant cannot be fixed. In addition, the supply agreement covered additional points. For example, if plaintiff were to move the machinery and equipment, General Foods was to share the cost of that move

up to $800,000. Likewise, General Foods retained an option to buy the property if plaintiff were to sell. Finally, General Foods had priority over all of plaintiff's other customers. In view of all the conditions, the court finds that the Woodburn plant cannot be used as a comparable sale.

## Cost Approach

Defendant's reproduction cost[6] approach is notable for some of its weaknesses. The primary appraiser inspected the plant approximately five years after the first year in question. He did not ask about conditions or changes in the equipment in the intervening years. He utilized "replacement cost used" to value the machinery and equipment but applied "observed" depreciation to the installation costs. As a result, he expected his installation costs to have a longer useful life than the machines.[7] The appraiser also used a government published statistic for inflation to account for physical depreciation.

Plaintiff's main criticism is defendant's failure to make adequate allowance for functional obsolescence and economic obsolescence. Defendant's appraiser allowed ten percent functional obsolescence on portions of the subject property. He believed that he was unable to quantify the amount of functional obsolescence. The ten percent was an estimate based on "gut feeling."[8] The appraiser testified that he did not ask plant management about excess operating costs. He also testified that he did not believe his assignment included computing functional obsolescence. Consequently, the appraiser made no effort to compute functional obsolescence due to layout. He conceded there could be some but "did not address it."

Discussion of plaintiff's claims of excess capital costs, excess operating costs and economic obsolescence follows:

---

[6] It is necessary to point out that defendant's cost approach is not a pure "reproduction cost new" approach. Defendant used the "replacement cost used" for some equipment, which captures some forms of functional and economic obsolescence. The appraiser also used "replacement cost new" as a factor in determining depreciation for the warehouse buildings.

[7] Someone on the appraisal team recognized that they should be the same since it is so indicated in the appraisal report.

[8] During its opening statement at the trial, defendant asked the court not to rely on its "gut feeling."

*Excess Capital Costs - Buildings*

■ Plaintiff calculated excess capital costs in the warehousing and processing plants. Plaintiff's appraiser testified that the subject warehouses, having a reproduction cost of $3,783,585, could be replaced with a smaller single warehouse costing $2,736,628. Defendant's appraiser compared his two cost measures and took the percent of difference between the two figures as functional obsolescence. Since his replacement cost was based on the same number of square feet as the existing buildings, but with high ceilings, his calculation overstates the portion considered good.

The court finds that the subject warehouses could be replaced with a single smaller building. The court chooses to use plaintiff's replacement cost of $2,736,628. Since defendant considered the subject property only 40 percent good, the depreciated replacement cost would be $1,094,651.[9] Defendant's indication of value by the cost approach should be reduced by $231,359, the net difference between the depreciated replacement cost and the depreciated reproduction cost.

In the processing area, plaintiff performed similar calculations as to all the plant buildings used for processing. Plaintiff calculated a reproduction cost of $13,213,099, less a replacement cost of $10,750,000, indicating excess capital costs of $2,463,099. Since this included the warehouses treated separately above, plaintiff eliminated the warehouse portion, leaving excess capital costs for processing of $1,416,142.

Defendant correctly points out that plaintiff made a math error in calculating the excess capital costs in processing. Plaintiff used 28 percent as physical depreciation. The correct physical depreciation was 51 percent. However, the biggest problem is plaintiff failed to establish a starting point. Defendant's reproduction cost is $10,931,696 for the total building and structures. This is so close to plaintiff's replacement cost of $10,750,000 that any attempt to adjust for a depreciated excess cost is meaningless, especially after deducting the warehouse portion. Further, although the category of "processing" may have been clear in plaintiff's cost approach, it is not clear in defendant's. In defendant's cost

---

[9] Plaintiff's figures are to be compared with defendant's reproduction cost of $3,324,208, depreciated to 40 percent good, or $1,326,010.

approach, the actual "processing" building was depreciated 80 percent. This must include a substantial allowance for functional obsolescence. The court finds that no excess capital costs should be deducted from defendant's depreciated cost figure.

*Excess Capital Costs - Machinery & Equipment*

Plaintiff calculated excess capital costs for machinery and equipment in three areas: refrigeration, boilers and canning equipment. Plaintiff calculated these costs as the difference between replacement cost and reproduction cost, less physical depreciation. However, defendant's appraisal already reflects the lower cost by using replacement cost *used.* Used equipment prices reflect such obsolescence and no further deductions need be made. For example, defendant's treatment of the boilers is close to the results plaintiff is advocating. That is, the percent good ranges from 50 percent to zero.

The court finds the same situation applies to canning equipment. Plaintiff proposes excess capital costs based on replacement cost new. Defendant's appraiser testified that he used replacement cost used, which takes into account the age, technological obsolescence and other forms of obsolescence of the subject property.

*Excess Operating Costs*

Plaintiff contends that functional obsolescence due to plant layout is not reflected in defendant's "unit specific" depreciation. As noted above, defendant's appraiser recognized there might be such obsolescence but felt he could not quantify it. In the warehousing area, plaintiff's appraiser testified that having a single warehouse could reduce the number of workmen and their lift trucks from five to two. This was based on estimates by factory personnel. This estimate seems reasonable considering the number of warehouses as well as the distances between them. Defendant did not rebut this testimony. Based on these estimates, plaintiff calculated that it could avoid $20,942[10] in excess annual expenses, which had a capitalized value of $67,555.

---

[10] Plaintiff's cost estimates seem low. Labor costs of $13,092 for three man years is equal to $4,364 per man per year. If a man year is equal to 160 hours per month, plaintiff's estimates would have the labor costs being less than the minimum wage.

■      Defendant's predominant measure was reproduction cost new. Defendant contends that functional obsolescence due to excess operating costs can only be deducted from replacement cost, not reproduction cost. As a generalization, defendant is correct. However, in judging whether to buy the subject property (reproduction cost) or replace it with a new property (replacement cost) the hypothetical buyer would compare operating costs as well as construction costs. If replacement cost is less than reproduction cost, excess operating costs are an additional penalty or deduction from replacement cost. Deducting excess operating costs (capitalized) from reproduction cost may not be the best indication of market value, but it is closer than using reproduction cost alone.[11]

Admittedly, functional obsolescence is an area of great confusion. Plaintiff's witness, Mr. Svoboda, agreed that one should deduct excess operating cost from replacement cost. Plaintiff concedes this in its brief. On the other hand, the standard text, *The Appraisal of Real Estate,* published by the American Institute of Real Estate Appraisers, 9th edition, at 392-93, indicates that an incurable functional deficiency is calculated the same way whether for replacement cost or reproduction cost.

The situation is similar to that found in *Publisher's Paper Co. v. Dept. of Rev.,* 270 Or 737, 747, 530 P2d 88, (1974), where the court allowed a deduction for excess operating costs from reproduction cost new. There the court said "[t]he goal is not theoretical purity but the proper estimate of fair market value." Where replacement cost is *less* than reproduction cost, reproduction cost is not the best measure of market value. If it is nevertheless used, functional obsolescence must be deducted from it. Otherwise, one would have to claim that reproduction cost alone is closer to market value than the lesser replacement cost minus functional obsolescence.[12]

---

[11] Appraising is not a set of formalistic rules to be applied without reasoning. It is simply an attempt to replicate the reasoning process engaged in by parties to a marketplace transaction.

[12] It is valid to ask whether this logic applies to components of property. That is, whether it can be applied to just warehousing versus the entire subject property. However, as here, where there is a mixture of reproduction cost with replacement cost used and replacement cost new, it would seem appropriate to apply it on a component basis.

The court concludes that the capitalized excess operating costs for warehousing should be deducted from defendant's depreciated reproduction cost figure. However, since defendant's appraiser testified that he already deducted 10 percent for functional obsolescence, plaintiff's figure must be reduced by that amount. For example, plaintiff's excess operating cost in warehousing is $67,555. If we assume defendant's 10 percent depreciation for functional obsolescence is $33,242, that would leave only $34,313 additional amount to be deducted from defendant's cost indicator value. It is not clear to the court what specific amount defendant's appraiser allowed. Accordingly, the court will order defendant to calculate the correct amounts. Likewise, plaintiff's calculation of excess operating costs for the cold storage in the amount of $87,355 is allowed, but must be reduced in the same manner. That is, the capitalized excess operating cost must be offset by any functional obsolescence already allowed by defendant.

Plaintiff also calculated excess operating costs in the area of palletizing, refrigeration, blanchers, bean graders and corn cutters. The court finds that none of these excess operating costs should be deducted from defendant's cost approach indicator. Defendant's replacement cost used approach already reflects functional obsolescence.[13]

The excess operating costs in the area of tote dumps was disputed. Plaintiff's appraiser testified that low ceilings required plaintiff to use tote dumps. Defendant maintains that although plaintiff raised the ceilings, it continued to use the tote dumps. Defendant infers that their use was not dictated by ceiling heights but by plaintiff's own management preferences. Plaintiff's witness, Mr. Isaac, was not clear on this point. After reviewing the evidence, the court finds that plaintiff has failed to prove the existence of excess operating costs in the tote dumps.

In the area of the waste water treatment, defendant disputed plaintiff's replacement cost estimate. Again, without a clear comparison of replacement cost to reproduction cost, there is no way to determine what the actual operating cost differential is. Plaintiff's witness agreed that the court must

---

[13] Plaintiff's own calculations in the area of palletizers shows that it costs more than can be saved.

compare the subject land cost plus operating costs with the land cost, equipment cost and operating costs of the replacement plant. The court is not persuaded that plaintiff's "estimates" were sufficiently accurate. Moving a plant outside a city has more ramifications than just water treatment costs. Plaintiff introduced no evidence of treatment costs of nearby plants such as the Dalgety or Libby-McNeill plants. Defendant's witness testified that the capital costs for the equipment could exceed $1 million. The court finds plaintiff failed to prove excess operating costs for the waste water treatment.

*Economic Obsolescence*

The final category of obsolescence claimed by plaintiff is economic obsolescence. Plaintiff determined that it has freight costs substantially higher than midwest and east coast plants. The evidence showed plaintiff shipped almost half of its 1983 production east of the Rocky Mountains. If plaintiff were located in the Midwest, it would have saved $903,000 in freight costs. Those excess annual costs have a capitalized value of $2,912,903. Plaintiff's witness noted that the Midwest also has advantages over the West Coast in labor costs and lower raw product costs. Consequently, plaintiff's appraiser concluded that the Midwest processors have a "distinct advantage." He opined this would dictate a premium in the purchase price of plants. However, the witness also recognized that the advantages are not all one-sided. Midwest electric power rates are higher. Oregon is a stable growing area resulting in consistent high quality. Defendant also introduced evidence that population trends and the positioning of the West Coast plants with regard to the Pacific Rim market are significant.

The court finds there are mixed advantages and disadvantages to particular areas. Plaintiff errs in measuring just one advantage and deducting it from reproduction cost. To measure economic obsolescence due to location, a complete comparison is required to see if the advantages and disadvantages of the respective locations affect the fair market value of a plant. *Ore. Portland Cement Co. v. Tax Com.,* 230 Or 389, 369 P2d 765 (1962).

In summary, the court finds that plaintiff's income approach does not adequately reflect the value of the tangible property. Likewise, the court can give little weight to the

market comparison approach of either party because of the extremes in the indicators and the size of the adjustments. The court finds the best indication of value is defendant's cost approach. However, that indication must be adjusted for functional obsolescence in the form of excess capital costs and excess operating costs as indicated above. Accordingly, defendant will prepare computations to determine adjustments to be made to its cost approach indicator of value consistent with the court's opinion. In accordance with Tax Court Rule 65, defendant will submit its computations to the court and a copy to plaintiff.

Costs to neither party.