# IN THE OREGON TAX COURT

BENJAMIN FRANKLIN SAVINGS AND LOAN
ASSOCIATION

*v.*

DEPARTMENT OF REVENUE

(TC 2697)

UNITED STATES NATIONAL BANK OF OREGON

*v.*

DEPARTMENT OF REVENUE

(TC 2698)

FAR WEST FEDERAL BANK

*v.*

DEPARTMENT OF REVENUE

(TC 2699)

AMERICAN SAVINGS AND LOAN ASSOCIATION

*v.*

DEPARTMENT OF REVENUE

(TC 2700)

FIRST INTERSTATE SERVICES

*v.*

DEPARTMENT OF REVENUE

(TC 2701)

Sharon Kelly, McGaughey & Kelly, Portland, represented plaintiffs.

Joseph Laronge, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered September 5, 1989.

**CARL N. BYERS, Judge.**

Plaintiffs are part of a group of Multnomah County taxpayers who challenged the 1987 assessed value of their computer equipment. At the administrative level, defendant combined the appeals for hearing. It issued one opinion and order establishing values for all of the equipment. Plaintiffs then appealed separately to this court. Inasmuch as these cases involve similar issues, the court consolidated them for trial.

The subject property is, with few exceptions, computer equipment used in plaintiffs' banking and savings and loan businesses. There are two main groups of equipment: central processing units and peripherals. Central processing units (CPUs) are the machines that actually process data or information. A CPU may also be called a "system," depending upon its features or configuration. Peripherals, the limbs of CPUs, are used to input and extract information. Peripherals are terminals, display stations, printers, discs, tapes, controls, modems, and data converters. A minor amount of the subject property is not computer equipment but is necessary to its operation. This group consists of such things as air conditioners, security systems and fire protection systems.

The subject property is personal property. Taxpayers report annually to the assessor all acquisitions and dispositions of personal property on a property tax return. ORS 308.290. Due to limited resources, assessors use mass

appraisal techniques to assess the property for taxation. The technique used for personal property is to develop and apply a depreciation schedule against the reported costs of the property. While such schedules are only rough guides, one virtue of their use is uniformity of assessments. Of course the validity of the assessment depends upon how close the schedule mimics market values.

Plaintiffs began questioning Multnomah County's computer depreciation schedule in 1986. Plaintiffs engaged the services of Michael T. Hellon ("plaintiffs' agent"). He had been successful in persuading the tax authorities in other states, such as Arizona, to adopt schedules providing for more rapid depreciation of computer equipment. However, when plaintiffs appealed the value of their computer equipment, defendant forsook its schedule for specific appraisal of the property. Although plaintiffs' agent seeks the adoption of a more liberal depreciation schedule, he agrees that the proper method to establish true cash value is by individual appraisal.

The parties agree that the property is assumed to be in good operating condition. They also agree that true cash value is best represented by the "retail" level of used computer prices. This is to be distinguished from wholesale, dealer's cost, salvage or auction values. It is sometimes difficult to ascertain the retail level because end users may purchase equipment for the same price as a dealer. Also, obsolete equipment may have no used market.

Obsolescence is the major issue in establishing computer values. The rate of technological change drives the rapid depreciation of computer equipment. New technology may cause a reduction in the list price of existing new equipment. It may also eliminate entirely any used market for the old technology equipment. Conversely, in the absence of technological change, used equipment may sell for as much or more than new, depending on supply and demand. Another less apparent manifestation of obsolescence is exerted through the maintenance agreements.

Computer equipment is maintained in good operating condition under the manufacturer's maintenance agreements. The availability of maintenance agreements directly affects the value of used computer equipment. For example, IBM

equipment retains its value longer than most other manufacturers because of its policy of providing maintenance agreements for all its equipment. Manufacturers may, as a matter of policy, increase the price of their maintenance agreements to induce users to buy new technology equipment. If a manufacturer notifies its customers that it is discontinuing its maintenance agreements on old equipment, the old equipment may have only scrap value.

In this case, both appraisers used what is commonly referred to as the replacement cost used approach. This is a cost approach to value based on the principle of substitution. That principle, as applied here, holds that a buyer will not pay more for the subject property than it would cost to replicate the property from the used equipment market. American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 35 (9th ed 1987). Typically, in industrial cases which involve large amounts of machinery and equipment, the replacement cost used approach includes the total cost to recreate the existing facility. Thus, the cost of freight, installation, and engineering are included as well as the cost of the equipment itself. *See Lebow v. Dept. of Rev.,* 10 OTR 53, 58 (1985). However, the appraisers in this case indicated that the estimation of such costs is impractical.

Plaintiffs' primary valuation witness was a dealer in computer equipment. She started selling both new and used computer equipment in 1981. Her expertise for expressing an opinion of value was based on her experience in the new and used market. Plaintiffs furnished her with descriptions of the equipment and she assigned specific values to each item. Some of the equipment was inadequately described. In such cases, the appraiser had to rely upon her experience to assume the presence or absence of certain features. Apparently this is not unusual in the marketplace. She testified that in the jargon of the industry, "vanilla" machines are those which are without easily identifiable features.

Where plaintiffs' appraiser could not identify the equipment, she used a depreciation table to value it. Where the description was inadequate but she believed that she knew enough about it that it had no market, she assigned a zero value to the equipment. Her appraisal shows a significant number of items were assigned zero values.

The subject property is identified by account numbers. Within each account number there may be a substantial number of individual pieces of computer equipment. Plaintiffs' witness individually appraised each piece of computer equipment. She then totaled those values to determine a total value for each of plaintiffs' account numbers.

Plaintiffs also submitted evidence as to the appropriate depreciation tables. Plaintiffs' agent testified as to his experience in developing tables in other states. He indicated that depreciation tables should be based on actual sales data from the market. Plaintiffs submitted evidence of numerous sales which were summarized in plaintiffs' Exhibit 14. Plaintiffs' agent testified that these sales substantiated the proposed depreciation table. His testimony was not persuasive. The bare numbers summarized on Exhibit 14 in no way support the table proposed by the witness. The witness was unable to give a convincing explanation of how the table is based on the data. He admitted he had not performed any statistical tests to establish the validity of the table. Perhaps more importantly, the witness admitted there was no linear regression exhibited in the numbers.

Several aspects of the plaintiffs' agent's testimony were puzzling. For example, he testified that he had asked a sophisticated computer information business to draw a statistical model of computer depreciation and it was unable to do so. Yet the depreciation table he proposes is in effect such a model. The witness also admitted that the tables he proposed were not an average for the whole population but just for the subject property. On the other hand, he indicated that the subject mix of computer equipment was unusual, one he had never seen before.

Plaintiffs attempted to further bolster their proposed depreciation tables by the testimony of an employee of the State of Arizona's Department of Revenue. He testified as to the depreciation schedules used in that state. He pointed out that the changes made by Arizona in its depreciation schedules were based on a study he had performed. From that study, he concluded that (1) trends were easily established, and (2) the greatest or most significant loss in value in computer equipment occurred during its first year (50 percent).

On cross-examination it appeared that only two sales made up the witness' first year sample. He then indicated that he must have used other information but could not remember how many items were included in that information for the first year.[1] The court found his explanations lacking. The court believes that it is difficult to establish the loss in value during the first year. Usually new equipment cannot be found on the used market. By the time a particular model shows up on the used market, technology may have changed.

The witness also admitted that he had previously recommended the Computer Price Guide and the Computer Price Watch, two trade publications, as excellent sources of information. In constructing a table for used computer equipment, it is important to compare the used price to the list (new) price one year after the equipment is "first shipped." In the Computer Price Watch in evidence for January 1986, the court found only one item which was first shipped in 1985 and listed on the used equipment market. That was an IBM 4381-M3 8MB/12 channels. The list price shown was $778,914. The used retail market price was $618,000, or 79 percent of list price. All other items first shipped in 1985 were shown as "new" for prices. The court also examined several items listed in the Computer Price Watch for the second year after they were first shipped. In reviewing the percentages good of those items, the court found that the average for the second year is approximately 65 percent good. The schedule proposed by plaintiffs' witness from Arizona was 30 percent good for the second year. This is less than half of the average value reported by the Computer Price Watch.

Defendant's case consisted of the testimony of two appraisal witnesses. The first was Svend Hartmann, hired by defendant to value most of the IBM equipment. This witness has approximately 20 years experience in the business. He is the president of a business which buys and sells new and used computer equipment. More important, he is the editor of Computer Price Guide. This is one of the major publications used in the industry for valuing used IBM computer equipment. He testified that the prices listed in this "blue book" for used IBM computer equipment are a distillation of all market

---

[1] None of that other information was exchanged with defendant in accordance with Tax Court Rule 56C.

information available at the time. Those prices represent the best collective judgment of him and his staff. This witness used the Computer Price Guide and the competing Computer Price Watch publication to value the specific IBM equipment involved in these cases.

Mr. Hartmann also found the description of some items inadequate. In many instances, he was able to identify the item by inferring a description from the plaintiffs' original cost. He did this based on his knowledge of what features may be necessary or always present with certain models of IBM equipment. This witness demonstrated extensive knowledge and understanding of the used computer equipment market. He criticized plaintiffs' appraiser's values by such comments as "impossibly low" and characterized them as mistakes or irrational. He also indicated that plaintiffs' values are inconsistent with the values reported in the Computer Price Guide and the Computer Price Watch.

Defendant's second appraisal witness was the personal property supervisor for Multnomah County. He valued the remainder of the computer equipment not valued by Mr. Hartmann. This witness has no particular expertise in computer equipment. However, he is experienced in valuing personal property. To establish used equipment values, he obtained specific estimates from managers, dealers and others. He relied upon these specific estimates to establish his market values. When he could not obtain an estimate of value for a specific item, he applied a depreciation table to the item's original cost. He constructed his depreciation tables by comparing plaintiffs' reported original costs to the market prices of equipment that did trade in the used market. The witness constructed two separate tables, one for IBM equipment and one for all other computer equipment.

In weighing the evidence, the court finds that plaintiffs' appraiser lacked persuasiveness. Her common answer in response to many questions was that she could not remember. She was vague as to details and unable to remember the names of dealers or others she had contacted. She did not appear familiar with the features of machines, leaving the court to surmise that perhaps there was too much "vanilla" in her mixture. Her practice of assigning zero value to numerous items of equipment appears unwarranted. She admitted that

she did not consider value to the owner. ORS 308.205. While this appraiser attempted to support plaintiffs' proposed depreciation table, she admitted she did not make a market study. Also, she performed no calculations to verify the table and was unaware of the range of sale prices used in the table. She had no records to support the conclusions she reached.

Plaintiffs' agent, who proposed the depreciation tables, lacked appraisal experience. Although he acted as a negotiator for taxpayers, he lacked credibility in many ways. His analysis of complex problems did not hold up on close examination. Some of his answers were inconsistent. His was an opinion in search of facts.

Defendant's witness for the IBM equipment was knowledgeable, reasoned and supported his opinion with facts. He was consistent in his views of the market. His explanations of the market forces were clear. His understanding of the specific equipment was demonstrated. In brief, his testimony was persuasive.

Defendant's second appraisal witness also supported his findings with facts. For example, he was able to name the individuals from whom he obtained his information. In estimating values for specific items of equipment, he often chose the middle or lower range in order to reflect the market average.

The court does have some concern that defendant's tables, showing the percent "good," might be on the high side. There could be several reasons for this. For example, it appears that the tables were unweighted with regard to the value of the equipment. That is, in computing the percentages, the appraiser gave the same weight to a $500 item as was given to a $500,000 item. Yet, the larger main frame systems appear to lose value more rapidly than the less costly peripherals. Also, defendant's tables are based on a comparison of plaintiffs' original cost with the used market values. The tables fail to distinguish items purchased new from items purchased used. On the other hand, it appears that plaintiffs purchased a number of items new for less than the new list price. Tables based on these latter items would tend to understate their used market value. Despite these weaknesses, the court finds that defendant's tables more accurately reflect market value than do plaintiffs' tables.

In accordance with the above, the court finds that the true cash value of the subject property as of January 1, 1986, is as set forth in Schedule "A," attached hereto and incorporated herein by reference.

Costs and disbursements shall be awarded to defendant.

## SCHEDULE A

## CASE NO. 2699 - FAR WEST FEDERAL BANK v. DEPARTMENT OF REVENUE

| Control Number | Account Number | True Cash Value |
|---|---|---|
| 001 | P-01-23540-00 | $ 28,463 |
| 002 | P-01-24500-00 | 27,002 |
| 003 | P-02-22040-00 | 27,329 |
| 004 | P-03-18530-00 | 32,820 |
| 005 | P-03-06835-30 | 28,552 |
| 006 | P-04-06720-00 | 32,820 |
| 007 | P-04-27712-00 | 27,894 |
| 008 | P-04-37145-00 | 25,368 |
| 009 | P-05-10644-00 | 6,148 |
| 010 | P-05-21612-65 | 50,370 |
| 011 | P-05-40900-00 | 58,568 |
| 012 | P-06-02320-01 | -0- |
| 013 | P-06-43950-00 | 19,942 |
| 014 | P-06-35505-00 | 32,720 |
| 015 | P-06-36330-00 | 60,638 |
| 016 | P-06-46160-00 | 36,976 |
| 017 | P-08-04163-00 | 18,454 |
| 018 | P-08-06205-00 | 32,820 |
| 019 | P-09-15020-00 | 32,820 |
| 020 | P-11-30310-00 | 2,539,831 |
| 021 | P-11-50200-00 | 194,782 |

## CASE NO. 2700 - AMERICAN SAVINGS & LOAN ASSOCIATION v. DEPARTMENT OF REVENUE

| Control Number | Account Number | True Cash Value |
|---|---|---|
| 022 | P-01-25700-00 | $ 705 |
| 023 | P-03-01375-20 | 372,755 |
| 024 | P-05-38875-12 | 46,851 |
|  | P-08-02700-52 | -0- |
| 025 | P-10-34200-00 | 771,025 |
| 026 | P-67-42000-18 | 93,601 |

## CASE NO. 2698 - UNITED STATES NATIONAL BANK OF OREGON v. DEPARTMENT OF REVENUE

| Control Number | Account Number | True Cash Value |
|---|---|---|
| 031 | P-01-24330-00 | $ 10,339 |

| | | |
|---|---|---|
| 032 | P-03-09030-00 | 9,597 |
| 033 | P-03-15305-00 | 21,874 |
| 034 | P-03-24560-00 | 6,259 |
| 035 | P-03-29180-00 | 5,115 |
| 036 | P-04-01860-00 | 5,939 |
| 037 | P-04-06700-00 | 10,028 |
| 038 | P-04-42080-00 | 8,098 |
| 039 | P-04-59889-00 | 1,335,330 |
| 040 | P-05-04038-00 | 4,439 |
| 041 | P-05-21646-50 | 5,120 |
| 042 | P-05-31940-00 | 22,679 |
| 043 | P-06-45648-00 | 13,814 |
| 044 | P-06-46990-00 | 4,952 |
| 045 | P-07-03490-00 | 5,647 |
| 046 | P-08-01165-00 | 11,119 |
| 047 | P-08-08279-30 | 25,205 |
| 048 | P-08-09833-00 | 37,379 |
| 049 | P-09-01070-00 | 21,563 |
| 050 | P-09-04456-00 | 14,642 |
| 051 | P-09-10815-50 | 16,384 |
| 052 | P-09-11624-95 | 10,199 |
| 053 | P-09-14967-10 | 20,011 |
| 055 | P-10-60400-00 | -0- |
| 056 | P-10-60400-00 | 505,092 |
| 057 | P-10-61900-00 | -0- |
| 058 | P-11-06302-00 | 579,495 |
| 059 | P-11-07002-00 | 9,170,130 |
| 060 | P-11-07002-01 | -0- |
| 061 | P-11-07005-02 | -0- |
| 062 | P-10-60200-10 | 22,809 |

## CASE NO. 2697 - BENJAMIN FRANKLIN SAVINGS & LOAN ASSOCIATION v. DEPARTMENT OF REVENUE

| Control Number | Account Number | True Cash Value |
|---|---|---|
| 071 | P-03-15020-00 | $ 6,240 |
| 072 | P-04-20525-00 | 7,765 |
| 073 | P-04-09556-00 | 6,981 |
| 074 | P-06-38840-00 | 4,505 |
| 075 | P-06-47010-00 | 15,948 |
| 076 | P-07-01122-00 | 44,542 |
| 077 | P-08-01150-00 | 52,910 |
| 078 | P-08-11450-00 | 6,009 |

| | | |
|---|---|---|
| 079 | P-09-00995-00 | 1,521 |
| 080 | P-09-10236-75 | 6,590 |
| 081 | P-10-40180-00 | 1,436,191 |

## CASE NO. 2701 - FIRST INTERSTATE SERVICES v. DEPARTMENT OF REVENUE

| Control Number | Account Number | True Cash Value |
|---|---|---|
| 090 | P-03-08585-00 | $5,320,035 |