Argued and submitted September 5, the judgment of the Tax Court reversed and
remanded for further proceedings, otherwise affirmed November 26, 1990

# BENJAMIN FRANKLIN
## SAVINGS and LOAN ASSOCIATION,
*Plaintiff/Appellant,*

*v.*

# DEPARTMENT OF REVENUE,
*Defendant/Respondent.*

(OTC 2697)

# UNITED STATES NATIONAL BANK of OREGON,
*Plaintiff/Appellant,*

*v.*

# DEPARTMENT OF REVENUE,
*Defendant/Respondent.*

(OTC 2698)

# FAR WEST FEDERAL BANK,
*Plaintiff/Appellant,*

*v.*

# DEPARTMENT OF REVENUE,
*Defendant/Respondent.*

(OTC 2699)

# AMERICAN SAVINGS and LOAN ASSOCIATION,
*Plaintiff/Appellant,*

*v.*

# DEPARTMENT OF REVENUE,
*Defendant/Respondent.*

(OTC 2700)

# FIRST INTERSTATE SERVICES,
*Plaintiff/Appellant,*

*v.*

# DEPARTMENT OF REVENUE,
*Defendant/Respondent.*

(OTC 2701; SC S36694)

801 P2d 771

Sharon E. Kelly, Portland, argued the cause and filed the brief for plaintiffs-appellants Benjamin Franklin Savings and Loan, United States National Bank, Far West Federal Bank, American Savings and Loan and First Interstate Services.

Joseph A. Laronge, Assistant Attorney General, Salem, argued the cause for defendant/respondent Oregon Department of Revenue. With him on the brief was Dave Frohnmayer, Attorney General, Salem.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Plaintiffs (taxpayers) challenged the 1987 assessed value of certain computer equipment (the property) used in their banking and savings and loan businesses.[1] Defendant Department of Revenue (the department) valued the property subject to this appeal at $26,452,567. After hearings before the Multnomah County Board of Equalization and the department, taxpayers appealed to the tax court.

Before trial, the tax court issued an order dismissing the appeal as to the assessed value of certain property on which taxpayers had paid taxes, but which they leased rather than owned. The tax court based its dismissal on taxpayers' failure to exhaust their administrative remedies with regard to that property. After trial, the tax court found the true cash value of the subject property as of January 1, 1986, to be $23,407,676[2] and awarded the department costs and disbursements. *Benj. Franklin Savings and Loan v. Dept. of Rev.,* 11 OTR 260 (1989).

Taxpayers appeal the pre-trial order dismissing their appeal with regard to their leased property, the tax court's valuation of the property that they owned, and the award of costs and disbursements to the department. On *de novo* review, ORS 305.445 and 19.125, we reverse and remand for further proceedings as to the award of costs and disbursements to the department; otherwise, we affirm.

### FACTS

A. *The Assessed Property.*

The property subject to this appeal is personal property used in taxpayers' banking and savings and loan businesses and is located in Multnomah County. The property consists of. computers and other property necessary to the operation of computers. The computer equipment includes

---

[1] Taxpayers started these cases as part of a larger group of taxpayers challenging the assessed values of property located in Washington, Clackamas, and Multnomah counties. Some cases were resolved at a hearing before the Department of Revenue or before trial in the tax court. All of the cases that remained were consolidated for trial in the tax court and for review in this court.

[2] Schedule A to the tax court's opinion contains a listing of specific property and values for each taxpayer.

central processing units (CPUs) and peripherals. A CPU is the "brain" of a computer. It is the machine that processes data. A CPU may also be called a "system" or a "main frame," depending on its features. Peripherals are hardware used to put information into and extract information from the CPU. Examples of peripherals are terminals, disk drives, tape drives, modems, and printers. The subject property that is not computer equipment, but is necessary to the operation of computers, consists of air conditioners, fire protection systems, and security systems. Taxpayers purchased the property between 1978 and 1985 at a combined acquisition cost exceeding $55,000,000. The parties agree that the property is assumed to be in good working condition.

B.   *The Appraisal and Assessment.*

Under ORS 308.290,[3] taxpayers reported all acquisitions and dispositions of personal property on their property tax returns. On their returns they provided information for each piece of property including a description of the property and the year and cost of its acquisition. Some of the descriptions provided by taxpayers were either inaccurate or incomplete.

Due to limited resources, county assessors typically use "mass appraisal techniques" to assess personal property for taxation. The assessors base their opinions of value on the information provided on the tax returns. They then develop and apply a depreciation schedule against the property's reported acquisition costs.[4] Generally, the older the property is, the less it is worth. "True cash value," however, is the

---

[3] ORS 308.290 provides in part:

"(1)(a)  Every person and the managing agent or officer of any firm, corporation or association owning, or having in possession or under control taxable personal property shall make a return of the property to the assessor of the county in which such property has its situs for taxation * * *.

"* * * * *

"(2)(a)  Each return of personal property shall contain a full listing of such property and a statement of its true cash value, including a separate listing of those items claimed to be exempt as imports or exports; or, at the option of the assessor, the return may contain a listing of the additions or retirements made since the prior January 1, indicating the book cost and the date of acquisition or retirement."

[4] "Mass appraisal" valuation is used because of the impracticability of appraising the value of each piece of personal property for each taxpayer.

statutory benchmark for tax-assessed valuation and is defined as "the market value of the property as of the assessment date." ORS 308.232; 308.205.[5] Therefore, as the tax court noted, the validity of the "mass appraisal" valuation depends on how accurately the depreciation schedule reflects market values. *Benj. Franklin Savings and Loan v. Dept. of Rev., supra,* 11 OTR at 262.

The depreciation schedule formulated by the department and adopted by Multnomah County in the 1987 tax year for the category of property at issue here was:[6]

| Age | Retained Value |
|-----|----------------|
| 1   | 88%            |
| 2   | 75%            |
| 3   | 63%            |
| 4   | 50%            |
| 5   | 38%            |
| 6   | 30%            |

The assessment date was January 1, 1986. At that time, as applied to taxpayers' property, the schedule resulted in an assessed value of $26,452,567.

## PROCEEDINGS BELOW

Taxpayers initially challenged the department's valuation before the Multnomah County Board of Equalization and then proceeded to a hearing before the department. Although taxpayers did not know the department's exact

---

[5] ORS 308.232 provides:

"All real or personal property within each county shall be valued and assessed at 100 percent of its true cash value."

ORS 308.205 provides in part:

"True cash value of all property, real and personal, means the market value of the property as of the assessment date. True cash value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue and in accordance with the following:

"(1) If the property has no immediate market value, its true cash value is the amount of money that would justly compensate the owner for loss of the property."

[6] The number in the left column represents the number of years since the date of purchase, and the number in the right column represents the percentage of retained value of the property as applied to its acquisition cost.

valuation figure at the time,[7] they challenged its appraisal by arguing that application of the 1987 depreciation schedule to their property resulted in a valuation exceeding its true cash value. Taxpayers argued that rapid advancement in computer technology, as reflected by market values, justified a more accelerated depreciation schedule. Their proposed schedule was:

| Age | Retained Value |
| --- | --- |
| 1 | 62% |
| 2 | 50% |
| 3 | 31% |
| 4 | 26% |
| 5 | 25% |

Before the hearing at the department level, however, the department had developed a revised computer equipment depreciation schedule for the 1988 tax year. That schedule provided:

| Age | Retained Value |
| --- | --- |
| 1 | 75% |
| 2 | 50% |
| 3 | 30% |
| 4 | 20% |
| 5 | 10% |

Ultimately, the department's Opinion and Order adopted the county's stipulation to have the 1988 schedule apply to taxpayers' property for the 1987 tax year.

Taxpayers then appealed to the tax court, alleging that application of the 1988 depreciation schedule to their property inflated its true cash value. Before trial, the tax court granted the department's motion to dismiss the appeal as to certain property leased by taxpayers. That property was deemed to be "lessor-assessed" property, because it is property owned by a third party and taxed under that third party's

---

[7] The reason is that no breakdowns of the total value and the tax, by category of property, *i.e.*, taxpayers' computers and related property versus taxpayers' other property, were provided to taxpayers until the department submitted a post-trial exhibit to the tax court showing the roll value assessment.

tax account number, but taxpayers are, because of lease provisions, responsible for payment of the tax.[8] In granting the department's motion, the tax court accepted its argument that, because taxpayers had described the property, the values for which they were challenging, in the proceedings below by *their* account number, they had failed to challenge the assessed value of the lessor-assessed property and, therefore, had failed to exhaust their administrative remedies with regard to that property. The tax court concluded, therefore, that it lacked subject matter jurisdiction to consider the assessments on the lessor-assessed property. As a result, the 1987 roll values of that property were considered unchallenged and, consequently, remained in effect.

At trial, the department chose to abandon its complete reliance on a depreciation schedule and, instead, made an item-by-item appraisal of taxpayers' property. Although taxpayers urged the tax court, as they do us, to adopt the mass appraisal schedule that they had proposed in the proceedings before the Board of Equalization and the department, their witnesses agreed with the department's witnesses that the proper method to establish property's true cash value is by individual appraisal. Both the department's and taxpayers' witnesses acknowledged, however, that a depreciation schedule is considered appropriate when no market information is available for a specific piece of property under consideration. Both parties, therefore, also presented evidence on depreciation.

Both parties began their respective valuations from common ground. They agreed that a market valuation, a determination of the property's retail value,[9] is the appropriate method of appraisal.[10] For determination of that value,

---

[8] This situation is specifically contemplated by the taxing scheme. *See* ORS 308.290(1)(a) ("as between * * * a lessor and lessee, the actual owner and the person in possession may agree between them as to who shall make the return and pay the tax * * *."); ORS 308.105(2) ("Personal property may be assessed in the name of the owner or any person having possession and control thereof.").

[9] The "retail" value is distinguished from wholesale, dealer's cost, salvage, or auction values.

[10] In the event the property has no market value, however, "its true cash value is the amount of money that would justly compensate the owner for loss of the property." ORS 308.205(1). This statutory directive is particularly relevant in this case because taxpayers' expert found that a significant number of items had no market value. However, rather than valuing each piece of property at "the amount of money that would justly compensate the owner" for its loss, she gave it a zero value.

"both appraisers used what is commonly referred to as the replacement cost used approach. This is a cost approach to value based on the principle of substitution. That principle, as applied here, holds that a buyer will not pay more for the subject property than it would cost to replicate the property from the used equipment market. American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 35 (9th ed 1987). Typically, in industrial cases which involve large amounts of machinery and equipment, the replacement cost used approach includes the total cost to recreate the existing facility. Thus, the cost of freight, installation, and engineering are included as well as the cost of the equipment itself. *See Lewbow v. Dept. of Rev.*, 10 OTR 53, 58 (1985). However, the appraisers in this case indicated that the estimation of such [incidental] costs is impractical." *Benj. Franklin Savings and Loan v. Dept. of Rev., supra*, 11 OTR at 263.

The parties also agreed that the market for computer technology is young and extremely volatile. That volatility is driven by the rapid rate of technological advancement. As new technology develops and new models of computers are placed on the market, older models with a similar use as the newer models become obsolete. The obsolescence of the older models decreases their value.

The final area of common ground was that the condition of computer equipment, and whether it is new or used, is a factor in determining its value. In that regard, maintenance agreements between a computer manufacturer and an end-user are significant. Under those agreements, the manufacturer typically agrees to keep the computers in good operating condition, perform normal maintenance, and make repairs as needed. In part, because International Business Machines (IBM) uses maintenance agreements extensively in the sale of the computers that it manufactures, IBM computers generally maintains their market value better than equipment from other manufacturers. Along the same lines, a manufacturer, in order to induce the purchase of new technology, may cancel or increase the price of its maintenance agreements. A computer not covered by a maintenance agreement may have only scrap value on the market.[11] Beyond these areas of common understanding the parties disagreed.

---

[11] This, however, does not mean that the equipment has no value to the user. *See supra*, n 10.

Taxpayers' primary valuation witness was Emily Clancy.[12] Clancy has been a dealer in both new and used computer equipment since 1981. Clancy made several assumptions about valuation of computer equipment: the value of used computers is based on the generation of the technology of those computers and an average generation is about three years; products only occasionally sell for list price and then only during the first two to three months after they are introduced; used equipment does not sell for more than list price; the used computer market contains transactions between end-users and between brokers, and assessment values should be the average of the prices in those transactions.

To value the property, taxpayers gave Clancy descriptions of that property. These were the same descriptions taxpayers had provided to the department on their tax returns. As noted, the descriptions of some of the property were either inaccurate or incomplete. On those items, Clancy was forced to make assumptions about the nature of the property. She made assumptions about what features a particular piece of property had, depending on its age and purchase price. Newer property typically had features with the latest technology, and more expensive property had more features. Where a feature was listed separately, it was appraised separately instead of within the total value of the system of which it was a part. Clancy assigned specific values to each item.

Clancy's appraisal process had three steps. First, she assigned a value to each item for which she could obtain market information. She testified that for one-half of those values she relied on actual sales data from sales of similar property.

---

[12] Taxpayers presented a second expert, Michael Hellon, who urged the adoption of an accelerated mass appraisal depreciation schedule. The table that he argued was justified in this case was the same table that taxpayers proposed before the Board of Equalization and in the hearings before the department. Hellon conceded, however, that individual appraisal is a more accurate method for establishing the true cash value of computers.

Because we determine that the majority of the property in this case was subject to individual appraisal, there is no need to consider the merits of Hellon's proposed mass appraisal depreciation schedule. Although we find that it is appropriate to apply a depreciation schedule to some of the property, the schedules applied are based on data that is specific as to the types and ages of property to which they are applied, as opposed to Hellon's mass depreciation schedule that is inherently general in nature. Therefore, we also find these specific schedules to be more appropriate for valuation of the subject property than Hellon's mass appraisal depreciation schedule.

For the remainder of those values she relied on other information provided by other computer dealers. Second, property for which she could find no market information, but for which she believed there was a used market, she applied a depreciation schedule. The values on that schedule were similar to those on the schedule requested by taxpayers in the proceedings before the Board of Equalization and the department. Finally, for items she considered obsolete, and for which she thought there would be no buyer, she assigned a zero value.

The department used two appraisers to value the subject property. Its first appraiser, Svend Hartmann, has been involved in the computer industry since 1965. He has been a member of the Computer Dealers Association since its founding in 1972, and has served as vice president and director of the Computer Dealers and Lessors Association, the successor organization to the Computer Dealers Association. He also is a member of the American Society of Computer Dealers. More importantly, however, he is president of Computer Merchants, Inc., which buys, sells, and leases new and used computer equipment, and publishes the Computer Price Guide (CPG), which Hartmann edits. The CPG is a major publication in the computer industry for valuing used IBM computer equipment. Hartmann used the CPG and the competing Computer Price Watch publication to value the specific IBM property in these cases.

Hartmann valued the bulk of the IBM property relevant to the appeal. To value that property, he relied on descriptions of the property contained in taxpayers' tax returns. Because of the incomplete descriptions on those lists, he supplemented the descriptions with information provided by pre-trial depositions. Nonetheless, some of the descriptions were still incomplete. Thus, like taxpayers' expert, Clancy, Hartmann was forced to make some assumptions about the property. He assumed that any optional features that were required for normal operation of the property were present. He also assumed that the components necessary to hook up a computer to its control unit were present. If optional features were listed separately, he assumed that they were installed, and, therefore, had a value as part of the system rather than as a separate piece of property. Where there were no indications of the property's features, he compared the IBM list price to the purchase price and assumed that the difference in price

would indicate what features were on the property. If it was impossible to tell the model of a particular machine, he assumed that it was the machine most commonly used by large financial institutions.

Hartmann's appraisal process had two steps. First, he looked at the January, 1986, CPG. If the property was listed there, he assigned the listed value. Second, for property with configurations not listed in the CPG, he either applied his best judgment, based on his knowledge of the market, as to what the price would be, or else he assigned the property a value based on a percentage of taxpayers' acquisition cost of the property. He derived the appropriate percentage by comparing the used price to the list price of the particular configuration from the CPG that was current at the time of his appraisal.

The department's second appraiser was John Webster. Although, as the personal property supervisor for Multnomah County, Webster had no particular expertise in valuing of computer equipment, he is a Certified Appraiser III in Oregon,[13] and previously did appraisals for the Continental Insurance Bureau.

Webster valued all of the property not appraised by Hartmann. Like Hartmann, Webster relied on descriptions of taxpayers' property augmented by information provided through discovery. His appraisal process had three steps. After he sorted the property by manufacturer and model, he first contacted computer dealers and manufacturers to get their opinion of the market value for each piece of property as of January, 1986. He contacted manufacturers initially to confirm model numbers, descriptions and costs and to determine who the major used computer dealers were for their products. In some cases, he relied on January 1986 advertisements for values. For most of the IBM property, if Hartmann had valued the same type of property, he assigned Hartmann's value, or if it was listed in the January, 1986, CPG, he applied that value.

Second, for property that Webster could not find market data, he applied a depreciation schedule. He made two

---

[13] The qualifications for all levels of certified appraisers are set forth in ORS 308.010, and in the administrative rule adopted pursuant to that statute, OAR 150-308.010.

schedules, one for IBM property and one for non-IBM property. Those schedules are:[14]

| Age | IBM Retained Value | Non-IBM Retained Value |
|-----|--------------------|------------------------|
| 1 | 100% | 80% |
| 2 | 87% | 45% |
| 3 | 45% | 38% |
| 4 | 33% | 30%* |
| 5 | 19%* | 23%* |
| 6 | 10%* | 17% |

Webster applied those schedules to about seven to eight percent of the IBM property and about five to seven percent of the non-IBM property. The schedules were applied to the acquisition cost, as opposed to the list price, of the property.

Clancy's valuation of taxpayers' property totaled $7,244,438.[15] Taxpayers' valuation, using their proposed mass appraisal schedule, was $12,425,887. Hartmann's and Webster's combined valuation was $23,407,676. The tax court accepted the Hartmann/Webster valuation as the true cash value of the subject property. *Benj. Franklin Savings and Loan v. Dept. of Rev., supra,* 11 OTR at 269-71.

## ANALYSIS

A.  *Valuation of Taxpayers' Property.*

1.  Contentions of the parties.

Taxpayers argue that the department's experts relied

---

[14] The percentages of retained value were calculated by comparing the totals of the values that he had already assigned to the relevant category of equipment, *i.e.,* same age and same manufacturer (IBM or non-IBM), to the total purchase cost of the same category of equipment. The values accompanied by an asterisk are the actual percentages applied by Webster in his valuation. The original percentages for those categories of equipment, however, as reflected by Webster's data, were much higher: for the IBM equipment, years five and six were respectively, 85% and 84%; for the non-IBM equipment, for years four and five, the numbers were, respectively, 48% and 35%. Webster concluded that those percentages were too high, because his samplings for those categories had been too small. Therefore, he adjusted the percentages downward in those categories to reflect market depreciation more accurately.

[15] This value is taken from the department's post-trial exhibit summarizing Clancy's appraisal. Taxpayers did not object to the accuracy of that exhibit. Although there is some discrepancy between this value and a similar summary introduced by taxpayers during trial, our disposition of this case makes the difference in values irrelevant.

on improper information in valuing their property and that, as a result, the assessed value of that property was higher than its true cash value, a violation of ORS 308.232 and 308.205. They argue further that, if we find that the department valued their property in excess of its true cash value, we should value their property using their mass appraisal schedule as they had proposed to the Board of Equalization and in the hearings before the department.[16]

The department argues that its appraisal was based on reliable and accurate information and that the value of the property, as determined by its experts and accepted by the tax court, does not exceed its true cash value. Further, the department argues that taxpayers' expert valuation is not supported by persuasive evidence and that taxpayers' depreciation table is not supported by substantiated data.

2. The Law.

■ Personal property is required to be valued and assessed at 100 percent of its true cash value. ORS 308.232. Our goal, therefore, is to determine what is the "true cash value" of the property under appeal. "True cash value" is defined as "the market value of the property as of the assessment date." ORS 308.205. If, however, "the property has no immediate market value, its true cash value is the amount of money that would justly compensate the owner for loss of the property." ORS 308.205(1). Consequently, to determine the true cash value of the property under appeal, we must determine if it has a market value, and, if not, what value would justly compensate the owner for its loss. In determining those values, however, the law does not provide fixed principles of valuation for the appraisal of property. The appropriateness of a particular method or combination of methods of valuation is a question of fact to be determined by the record in each case. *Brooks Resources Corp. v. Dept. of Rev.,* 286 Or 499, 503-04, 595 P2d 1358 (1979).

---

[16] Interestingly, in requesting relief in this court, taxpayers ask only for application of their mass appraisal depreciation schedule for a proper determination of the true cash value of their property. Although they present evidence before us of Clancy's qualifications, her valuation methods and valuation, *they do not ask us to accept her figures.*

### 3. Analysis.

As was the tax court, we are persuaded that the department's evidence of value for taxpayers' property accurately reflects that property's true cash value. The tax court found that Hartmann was "knowledgeable, reasoned and supported his opinion with facts. He was consistent in his views of the market. His explanation of the market forces were clear. His understanding of the specific equipment was demonstrated. In brief, his testimony was persuasive." *Benj. Franklin Savings and Loan v. Dept. of Rev., supra,* 11 OTR at 267. The court further found that Webster "also supported his findings with facts." *Id.* Finally the court found that the department's depreciation tables "more accurately reflect market value than do [taxpayers'] tables." *Id.*

Taxpayers' primary objection to Hartmann's appraisal is his heavy reliance on the January, 1986, CPG. Taxpayers argue, among other things, that the prices in the CPG are not based on actual market sales and that they are merely advertised prices for Hartmann's company, Computer Merchants, Inc. Taxpayers argue further that the prices include costs of dealer markups and refurbishing equipment and that the prices in the January, 1986, CPG are actually prices from December, 1985, which were unusually high because of year-end tax-avoidance transactions.

Hartmann testified that the prices in the CPG result from the compilation of data about actual sales prices of the equipment listed in the CPG and the application of experience and knowledge of the market to that data by Hartmann and an eight-person marketing team. Thus, contrary to taxpayers' assertion, the CPG is based on actual computer sales, although sales are not the only source of information. The CPG is published quarterly, and the prices in a given issue represent the fair market value of the listed computers for the period immediately preceding publication. Hartmann testified that he and his staff make the final checks as to the accuracy of the information in the early weeks of January and that the information in the January CPG is accurate as of that time. The CPG does not simply average the transactions that took place for the last quarter; rather, Hartmann and his team adjust the price for fluctuations in the volatile computer market.

Hartmann also denied that the prices include costs of refurbishment and dealer markups and that they are merely advertisements for his company. He stated that the prices at which his company might sell a computer could be different than the price in the CPG, even a few weeks after publication. This, he stated, is true, because of the rapid fluctuations in the market.

Nonetheless, it is our conclusion that the CPG prices would still be valuable for the tax valuation, because the date for valuation and assessment purposes is January, 1986, the date of publication for the relevant CPG. After reviewing Hartmann's testimony, we agree with the tax court's findings of the persuasiveness of Hartmann's appraisal. *Benj. Franklin Savings and Loan v. Dept. of Rev., supra,* 11 OTR at 267. Consequently, for the property that Hartmann valued, we accept his appraisal as an accurate reflection of the market value, *i.e.,* true cash value, of that property.[17]

Taxpayers also contend that Webster, the department's appraiser for the remainder of the property, overstated its market value. We do not find that contention to be persuasive. Taxpayers first argue that Webster overvalued most of the IBM property that he appraised, because he either applied the same value as Hartmann had used for the same type of property, or else he applied the value from the January, 1986, CPG. As noted above, however, we find that neither Hartmann's valuation nor the values from the CPG exceed the property's true cash value.

Second, taxpayers object to Webster's valuations made from information provided by computer manufacturers and dealers. This objection does not persuade us that Webster's valuation was unreliable. In basing his valuation on that information, Webster made detailed logs of his contacts, unlike taxpayers' expert, and testified at trial as to the precise valuations made by many of his contacts. When a number of values were given, he chose the middle or lower range of those values. Finally, there is no evidence that the values that he obtained were inaccurate. In short, we agree with the tax court, which found Webster's value to be reasoned and supported by the facts. *Benj. Franklin Savings and Loan v. Dept.*

---

[17] Taxpayers' other arguments against Hartmann's valuation techniques are not persuasive.

*of Rev., supra,* 11 OTR at 260. We, therefore, accept Webster's appraisal of all of taxpayers' property not valued by Hartmann, as the true cash value of that property.

Furthermore, we do not find the testimony of tax-payers' expert, Clancy, to be as persuasive as that of Hartmann and Webster. In making her valuations, Clancy relied on the descriptions of taxpayers' property which they had provided on their returns. All of the parties agreed that the descriptions on that list were inaccurate or incomplete in many cases. For that reason, Hartmann and Webster relied on improved descriptions of the property gained through deposi-tions before trial. Clancy did not rely on the updated descrip-tions. Thus, the number of assumptions that she was forced to make about the type of property under appeal increased. Her testimony revealed that she was generally unfamiliar with the features of the relevant computers. *Benj. Franklin Savings and Loan v. Dept. of Rev., supra,* 11 OTR at 266. Clancy's general lack of familiarity with the property, coupled with her increased use of assumptions in making her valuation, enlarged the potential for error in her appraisal figure.

■ Additionally, Clancy testified that she based one-half of her valuation on actual computer sales. However, she did not produce any records of those sales. For the other one-half of the values, she testified that she relied on information from computer dealers. However, she was unable to recall the names of the dealers whom she testified she had contacted. Finally, Clancy assigned a zero value to many items. For example, she assigned a zero value to 1,429 one-year old items. Taxpayers paid over two million dollars for those items. Even if there were no value for the property on the open market, the true cash value of the property must be determined by "the amount of money that would justly compensate the owner for loss of the property." ORS 308.205(1). Clancy's valuation did not satisfy this statutory directive.

On *de novo* review, we hold that the true cash value of taxpayers' owned computer and computer-related personal property for the 1987 tax year is $23,407,676. We therefore affirm the tax court's appraisal of that property as expressed in schedule A to the tax court's opinion. *Benj. Franklin Sav-ings and Loan v. Dept. of Rev., supra,* 11 OTR at 269-71.

B.  *Dismissal of the Lessor-Assessed Property.*

  1.  Contentions of the parties.

  Taxpayers argue that the tax court erred in dismissing their appeal with regard to their lessor-assessed property. The tax court dismissed their appeal as to that property, because they did not challenge the department's original valuation before the Board of Equalization and the department. The tax court concluded that they did not challenge that property, because they had inadequately described it in the prior proceedings. Taxpayers argue, among other things, that the descriptions that they provided were sufficient to inform all of the parties that the assessed value of the lessor-assessed property was being challenged.[18]

  The department argues that the tax court properly dismissed the appeal with regard to the lessor-assessed property because taxpayers failed to challenge its assessed value explicitly in the earlier proceedings. It argues that the tax court was without subject matter jurisdiction to entertain challenges to the valuation of the leased property, because taxpayers had failed to exhaust their administrative remedies with regard to those values.

  2.  The Law.

  In an appeal from the Board of Equalization to the department, the appellant must file a petition. The petition must describe the property to which the appeal relates. ORS 305.275(5). In order to provide appropriate notice to the department, or the non-appealing party, the petition must contain "the assessor's tax account number or identification number of the property in question * * *." OAR 150-305.275-(A)(1)(e). The assessed value of any property not described in the petition is not considered challenged. Were the result otherwise, on a taxpayer's filing of a petition challenging an assessment in a given tax year, the department would have to consider the assessed value on *all* of the taxpayer's property. Such a system, as the department asserts, "would create havoc."

  If a party fails to challenge the assessed value of its

---

[18] Taxpayers make other arguments as to why the department was on notice of a challenge to the values of the lessor-assessed property, but we do not find those arguments persuasive.

property before the appropriate county Board of Equalization and the department, and thereby fails to exhaust the party's administrative remedies, the tax court is without subject matter jurisdiction to hear the challenge as to that property. ORS 305.275(4);[19] *Dennehy v. Dept. of Rev.,* 295 Or 574, 579, 668 P2d 1210 (1983).

### 3. Analysis.

■    The tax court's order dismissing taxpayers' appeal as to the lessor-assessed properties analyzed this issue:

> "The problem appears to arise from [taxpayers'] use of account numbers to identify the property under appeal. [Taxpayers] reported *all* of its computer equipment, both leased and owned, to Multnomah County on its personal property tax return. The personal property tax return shows only one tax account number. Of the leased equipment thus reported, some of it would be assessed under that tax account number to [taxpayers] as the lessee. However, as to leased property which is assessed to the lessor-owner, such property is not included under the account numbers appealed. Rather, it is assessed to the lessor by a separate account number. The fact that [taxpayers] lumps lessor-assessed property with other property on its personal property tax return does not change the assessor's list of property for an account number.

> "[Taxpayers'] appeal to the board of equalization was on a printed form supplied by Multnomah County. That form identified the property by the assessor's account number. The property within that account number does not include lessor-assessed property. [The department] argues that it was not aware [taxpayers were] appealing its lessor-assessed leased property until depositions were taken after [taxpayers] filed its appeal with this court. [Taxpayers] counters that it at all times expressed to [the department] that all of its computer equipment, owned and leased, was subject to appeal. However, [taxpayers'] evidence submitted in opposition to defendant's motion [to dismiss] merely references the property by account number.

---

[19] ORS 305.275(4) provides:

"Except as provided in ORS 118.350 and 305.410, no person shall appeal to the Oregon Tax Court or other court on any matter arising under the revenue and tax laws administered by the department unless the person first exhausts the administrative remedies provided before the department and the director."

Taxpayers do not argue that either ORS 118.350 or 305.410 applies in this case.

"Inasmuch as the lessor-assessed account numbers were not used to identify the property under appeal, [taxpayers'] appeal failed to include the lessor-assessed property. The court, therefore, finds that this appeal is limited to property listed by the assessor under the identified account numbers. The court further finds that the lessor-assessed property was not part of the personal property appealed by [taxpayers] to the board of equalization. Accordingly, [taxpayers] failed to exhaust its administrative remedies as to that property."

We approve the tax court's reasoning and adopt it as our own. The tax court lacked subject matter jurisdiction to consider the appeals as to the lessor-assessed property. Consequently, we affirm the dismissal of taxpayers' appeals as to that property.

### C. *Award of Costs and Disbursements to Department.*

#### 1. Contentions of the parties.

Taxpayers assert that, although the tax court agreed with virtually all of the department's evidence and accepted the department's experts' opinion as to the true cash value of the subject property, they, rather than the department, were the prevailing parties and, thus, they must be awarded costs and disbursements by the tax court. They posit that they prevailed because, under the tax court's judgment, the valuation of their owned property was more than three million dollars less than the department's initial appraisal.

The department asserts that, although taxpayers' assertions are facially true, the department's initial appraisal was too high only because of taxpayers' failure to: "(1) timely report dispositions, (2) correctly report acquisition years and costs, and (3) file correct and complete equipment descriptions." The department posits that, but for taxpayers' original reporting errors, the tax court's valuation would have been higher than the department's initial appraisal using the mass appraisal depreciation schedule, and, therefore, the tax court's award of costs and disbursements to the department was proper.

#### 2. The Law.

The tax court allows costs and disbursements pursuant to TCR 68B, which provides:

"In any action, costs and disbursements shall be allowed to

the prevailing party, unless these rules or other rule or statute direct that in the particular case costs and disbursements shall not be allowed to the prevailing party or shall be allowed to some other party, or unless the court otherwise directs. If, under a special provision of these rules or any other rule or statute, a party has a right to recover costs, such party shall also have a right to recover disbursements."

3. Analysis.

The department's original valuation of taxpayers' property was $26,452,567. The ultimate valuation by the tax court was $23,407,676. The difference in those two values is over three million dollars. We find, therefore, that taxpayers were the "prevailing parties" in the tax court because the court substantially reduced the valuation of their property. The tax court's award of costs and disbursements to the department was not authorized, and it is reversed.

That reversal, however, does not necessarily entitle taxpayers to an award of costs and disbursements in the tax court. OTCR 68B permits that court to direct that no costs and disbursements be allowed. Accordingly, we remand to the tax court to consider whether costs and disbursements should be awarded to taxpayers.

## CONCLUSION

In sum, we reverse the tax court's award of costs and disbursements to the department and remand to the tax court to consider whether costs and disbursements should be awarded to taxpayers. Otherwise, we affirm the tax court's judgment.

The judgment of the Oregon Tax Court is reversed and remanded for further proceedings as to the award of costs and disbursements to the Department of Revenue; otherwise affirmed.[20]

---

[20] We do not allow costs and disbursements to either party on this appeal. Taxpayers did not obtain a "substantial modification" of the tax court's judgment which could entitle them to such an award, ORAP 13.05, and we direct that the department shall not be allowed such an award in this case, ORS 20.310.